UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OKLAHOMA

In re: )
) Chapter 9
CRAIG COUNTY HOSPITAL AUTHORITY, )
a Public Trust, ) Case No. 15-10277
Debtor. )

### DECLARATION OF HERB CRUM
### IN SUPPORT OF CRAIG COUNTY HOSPITAL
### AUTHORITY'S STATEMENT OF QUALIFICATIONS
### PURSUANT TO SECTION 109(c) OF THE BANKRUPTCY CODE

I, Herb Crum, hereby declare under penalty of perjury pursuant to 28 U.S.C. §1746 as follows:

1. That I am contracted with Craig County Hospital Authority, an Oklahoma Public Trust d/b/a Craig General Hospital ("CGH" or the "Hospital") as Interim Chief Executive Officer.

2. CGH has filed its Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code certifying that CGH satisfies each of the criteria set forth in section 109(c) of title 11 of the United States Code (the "Bankruptcy Code") for determining its eligibility to be a Debtor under chapter 9 of the Bankruptcy Code which includes a Memorandum of Law in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Statement of Qualifications and the Memorandum of Law"). This Declaration is made in support of the Statement of Qualifications and the Memorandum of Law.

3. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge and information derived from my contract duties with CGH that are described below. I am over 21 years of age, and I would be competent to testify to the facts set forth herein.

1

### Education and Experience

4.  My career experience, prior to commencing work for CGH is as summarized in the CV attached as Exhibit "A" hereto.

### Craig General Hospital

5.  Craig County, in 1963, established Craig General Hospital as a county hospital pursuant to Title 19 Chapter 17 of the Oklahoma Statutes. In June of 1993, a trust indenture creating the Craig County Hospital Authority established a public trust to operate Craig General Hospital and all its associated activities. (As such, CGH is a statutorily authorized public trust under applicable Oklahoma law.) The Craig County Commissioners thereupon leased the hospital real estate, buildings and all associated facilities to the Public Trust for a nominal, annual consideration. Since then the Craig County Hospital Authority Public Trust has expanded operations through bond issues and other debt undertakings, constructing, among other things, a new physicians medical office building adjacent to the hospital, a new outpatient and birthing suite addition to the main hospital building, and outpatient clinics at Miami, Welch, Langley and Monkey Island, thereby greatly enhancing CGH's ability to meet the health care needs of the residents of Craig and adjacent counties.

6.  I understand that CGH is authorized to file this Voluntary Petition under Chapter 9 of the Bankruptcy Code by the relevant Oklahoma statutes: 62 Okl.Stat. §§282 and 283.

7.  The Hospital operates a 24-hour emergency department which receives approximately 10,050 annual visits. The Hospital also offers a number of other healthcare services, including surgery services, rehabilitation services, mental health services, birthing services and acute care.

8.  The Hospital has 62 licensed hospital beds, employs approximately 330 people and admits approximately 2,354 patients annually.  Its annual payroll is approximately $10,000,000.00.

9.  The Hospital has 10 doctors on regular medical staff and is served by more than 20 visiting physicians representing a number of specialties.

### Genesis of Need for Financial Reorganization

10.  Rural hospitals in Oklahoma and elsewhere in the midwest have experienced increasing economic challenges throughout the last two decades.  Rural hospital patients, more often than not, have no commercial insurance and are dependent on Medicare, Medicaid or self pay.  Medicare/Medicaid reimbursement margins have fallen significantly in recent years, and the financial crisis of 2008 left many patients without job associated insurance and without any income enabling them to self-pay for medical services.  CGH, like every other rural provider in the country suffered from these developments.  CGH, moreover, in September, 2013, was surveyed and inspected by the Oklahoma State Department of Health which resulted in an unanticipated closure and suspension of the Hospital's operating room, surgical services and obstetric services pending an extensive remodel which cost the Hospital in excess of $700,000.00 and necessitated a 4 month suspension of surgeries resulting in a revenue loss of approximately $825,000.00.

11.  CGH is generally not paying its debts as they become due because does not have the financial ability to do so. CGH owes unsecured trade debts in excess of $1,400,000 plus the claims of Oklahoma Public Employee Retirement System ("OPERS").

12.  CGH desires to implement a plan to adjust its debts. CGH has negotiated with OPERS, and the negotiations with OPERS were futile.  CGH has and continues to diligently

3

pursue efforts confirm and implement a Chapter 9 Plan. I have reviewed the detailed financial analysis of the proposed Chapter 9 Plan prepared by Mr. Koehler and in my opinion that the same is economically feasible.

### Oklahoma Public Employees Retirement System Costs

13. As CGH undertook to deal with these unexpected revenue crises, it faced an ever increasing, payroll cost burden by reason of its participation in the OPERS. The OPERS retirement system, for all employees who began service on or before December 5, 2014, is a "defined benefit" program that has become ruinously expensive with ever increasing employer contributions mandated over the past two decades. Presently, CGH's obligation to OPERS equals 11.5 percent of total payroll, a figure approximately three times the cost of an equivalent defined contribution (e.g. 401K) type program. Unlike cities and municipalities that can raise taxes to meet such costs, CGH receives no tax revenue whatever. (CGH is the only Oklahoma hospital authority that still participates in OPERS.) Simply stated, the cost of continuing participation in OPERS would force CGH to close its doors in the near future. A key component of the reorganization plan that CGH intends to propose will be its withdrawal from OPERS.

14. Based on the best information presently available, CGH owes approximately $3,000,000.00 to OPERS, and does not have the ability to pay the present value of its debt to OPERS within a reasonable time period. The actual amount of the claim held by OPERS requires an actuarial analysis for which OPERS has demanded CGH pay approximately $25,000 in advance. CGH declined to pay OPERS to determine the amount of its unsecured, non-priority claim. As such, the actual amount of OPERS' claim is believed to be unliquidated and disputed as of the Petition Date.

15.     The negotiations with the OPERS were unsuccessful and indeed are in fact impractical because Joe Fox, General Counsel and Acting Director of OPERS advised CGH's counsel that "OPERS does not have the authority to accept less than the actuarially required amount to withdraw from the plan. The acceptance of any amount less than what is owed would place OPERS in the position of paying a large portion of the expense of all current and future (vested) retirees from the Hospital. I do not think OPERS has any ability or authority to accept this financial burden which by law has been placed on the participating employer."

16.     CGH estimates it owes OPERS approximately $3,000,000 and does not have the ability to repay the present value of such amount in full over any reasonable time period. Consequently, as shown above, further negotiations with OPERS are futile and impractical. To further illustrate the difficulties with OPERS, CGH recently received a written demand from OPERS asserting that the Hospital must not only pay the claim to OPERS in full, but must do so before OPERS will recognize the Hospital's withdrawal from the OPERS retirement system. As a practical matter OPERS demands payment in full in cash of its entire claim plus ongoing claims for contributions of funds until such is paid. It is critical to the economic viability of CGH that it exit the OPERS retirement system and deal with the $3,000,000 claim by means of the relief afforded under Chapter 9.

## Negotiations With Other Creditors

17.     CGH has 572 unsecured creditors holding claims in excess of $1,400,000[1] the largest of which is approximately $275,000. It is impracticable to negotiate with a large group for whom there is no natural representative capable of bargaining on their behalf.

---

1 This amount does not include the OPERS claims, but if such are included, then the total unsecured claims approach $5,000,000.00.

5

18. CGH has negotiated with the First National Bank of Vinita ("FNB") and has reached an agreement to modify the terms of its existing loan consistent with the Chapter 9 Plan CGH intends to file. In addition, FNB has agreed to loan CGH up to $600,000 as a post-petition line of credit to facilitate a successful reorganization.

### Transition to All-Electronic Healthcare Records ("HER")

19. CGH, like all other rural hospitals, is facing a new and continuing cost of doing business as it necessarily expends resources to transition all of its healthcare record keeping to electronic systems, a change that, without question, greatly increases patient safety and healthcare quality. A report recently prepared by a contractor at the instance of the National Coordinator for Health Information Technology succinctly explains the problem as follows:

> Small, rural hospitals face significant challenges[2] relating to the short and long-term costs of EHR investment. As hospitals are spending on health IT, revenues are decreasing due to patients shifting to the outpatient setting. Use of internal funds for EHR implementation is subject to fluctuations in hospital finances from one year to another. While hospitals expect that EHRs will improve care, they do not expect to realize economic gains sufficient to offset costs completely, therefore creating permanent additions to annual budgets. Meaningful Use estimates indicate that once hospitals are able to attest to Meaningful Use, the incentives and reimbursements will offset a portion of the EHR investment costs, and in some cases may provide a surplus that can support ongoing maintenance and sustainment costs.
>
> Beyond the initial cost of implementation, health IT continues to be a financial burden on small, rural hospitals. There are significant yearly maintenance costs, including software, hardware, training, and hiring additional IT staffing. Furthermore, as hospitals upgrade software, capital must be continually invested to maintain, upgrade

---

[2] The companion report, *Economic Case Study: Overcoming Challenges to Health IT Adoption in Small, Rural hospitals – Financial Evaluation,* is a detailed assessment of the financial impact of EHR implementation and related incentives, but is an internal ONC document as it contains information on the financial status of each participating hospital.

> and build necessary interfaces for the systems. The cost of interfaces is often an unanticipated cost at the onset of implementation and can become a significant burden to some hospitals. Hospitals struggle to estimate and plan for the sustainability of their health IT investments. The relatively small pool of financial resources available to small, rural hospitals also restricts the ability to conserve capital for sustainment beyond the large investment necessary for implementation.

For further information see http://www.healthit.gov/sites/default/files/pdf/OvercomingChallenges_in_SmallRuralHospitals.pdf

### Attempts to Address Financial Crisis Prior to Consideration of Bankruptcy Petition

20. CGH trustees quickly recognized that the closure of the operating room and the attendant loss of revenue posed a clear threat to the continued existence of the hospital and its clinics. CGH had 29 days in cash at that the time that the Oklahoma Health Department ordered the immediate closure of the emergency room. Cash was totally exhausted by August, 2014, with the result that the Authority could not have made payroll on October 10, 2014 and November 21, 2014, but for the gracious agreement of First National Bank, Vinita, to honor all checks on CGH's overdrawn payroll account.

21. Recognizing the immediate danger that the hospital faced, management took quick action to cut costs through a combination of layoffs and unreplaced attrition. At the direction of the Board of Trustees, management also marketed and sold the hospital owned apartment building adjoining the hospital campus. The property was sold to Steve and Toni Stanley, unrelated third parties, for $430,000.00, an amount in excess of its appraised value and sufficient to fully retire the $426,941.00 mortgage encumbering the property. This debt was the only bond indenture of CGH and was administered by the Bank of Oklahoma.

7

22. Additional financial retrenchment efforts include the listing for sale of CGH's Miami, Oklahoma medical office building, an effort, which if successful, would result in the retirement of approximately $1,000,000.00 in mortgage secured debt.

23. The hospital has taken significant cost cutting measures consistent with continuation of efficient, safe and high quality patient care, has publicly committed that it will meet the health care needs of its northeast Oklahoma community without interruption, and promised that CGH employees will not see any disruption of their paychecks or health insurance coverage. To attain these goals the Hospital Trustees, who are appointed by The Craig County Commissioners and who serve without pay and are responsible for balancing financial decisions with community concerns, have directed management to take every action necessary to seek relief for CGH under Chapter 9 of the Bankruptcy Code.

## CGH's SECURED DEBT

24. CGH is indebted to FNB in the approximate amount of $1,529,233.00 pursuant to certain documents executed and delivered to FNB by CGH, including, without limitation, that certain Promissory Note dated August 14, 2009 and certain real property mortgages related thereto (as heretofore amended and supplemented from time to time, the "FNB Credit Agreement"). The FNB Credit Agreement was originally between the Oklahoma State Bank ("OSB") and CGH, however the FNB has acquired FNB Credit Agreement from OSB. FNB claims a first in priority real property mortgage upon real property of CGH located in Langley and Vinita, Oklahoma (the "FNB Pre-Petition Collateral").

25. The FNB Credit Agreement, and all notes, security agreements, assignments, pledges, mortgages, deeds of trust, guaranties, forbearance agreements, letters of credit, and other instruments or documents executed in connection therewith or related thereto are referred to herein

8

collectively as the "Pre-Petition Claim Documents."

26. CGH is also are indebted to SpiritBank, an Oklahoma Banking Corporation ("SpiritBank") in the approximate amount of $950,000.00 pursuant to certain documents executed and delivered to SpiritBank by CGH including, without limitation, the Commercial Loan Agreement dated May 28th, 2009 (the "SpiritBank Loan Agreement") and the related notes, real property mortgage and other agreements as each may have been heretofore amended and supplemented from time to time, the "SpiritBank Credit Agreement"). SpiritBank claims a first in priority real property mortgage upon real property of CGH located in Miami, Oklahoma where there is a medical office building.

27. CGH is also indebted to Arvest Bank, an Oklahoma Banking Corporation ("Arvest") in the approximate amount of $1,772,825.00 pursuant to certain documents executed and delivered to Arvest by CGH including, without limitation, a promissory note and mortgage dated October 14, 2013 (the "Arvest Loan Agreement") and the related agreements as each may have been heretofore amended and supplemented from time to time, (the "Arvest Credit Agreement"). Arvest claims a first in priority real property mortgage upon real property of CGH located on Monkey Island at Grand Lake which is in Delaware County, Oklahoma where CGH operates a medical clinic.

28. CGH is also indebted to several equipment finance companies for purchase money lease/financing agreements in the approximately amount of $750,000.00 (collectively, the "Equipment Leases"). As of the Petition Date, CGH was not in default on its obligations to FNB, SpiritBank, Arvest Bank and the Equipment Leases.

29. Pursuant to the FNB Credit Agreement and applicable law, FNB holds a valid, enforceable, and allowable claim against CGH, as of the Petition Date, as stated above plus any

9

and all other interest, fees, costs, expenses, charges, and other claims, debts, or obligations of CGH to FNB that have accrued as of the Petition Date under the FNB Credit Agreement and applicable law. FNB's claim as described in the preceding sentence together with all post-Petition Date interest, fees, costs, and charges allowed to FNB on such claim pursuant to Bankruptcy Code § 506(b) are collectively referred to hereunder as the "FNB Pre-Petition Claim".

30. CGH believes that the FNB Pre-Petition Claim constitutes a valid obligation. Subject only to the Prior Liens (as defined below), the FNB Pre-Petition Claim is secured by properly perfected first priority liens upon and security interests in the FNB Pre-Petition Collateral (the "Pre-Petition Collateral").

31. The security interests and liens of FNB do not have priority over any other valid, perfected and unavoidable liens and security interests of any other secured creditor in any assets of CGH existing on the Petition Date that are senior in priority under applicable law to FNB's liens and security interests granted under the Loan Agreement in the Pre-Petition Collateral such as the liens held by SpiritBank, Arvest Bank and the Equipment Leases (collectively, the "Prior Liens").

32. CGH does not have sufficient available sources of working capital or cash to continue the operation of its business in this chapter 9 case without access to the Loan Facility. As stated above, CGH has negotiated a post-petition loan agreement with FNB for a line of credit of up to $600,000 to be secured by a lien that is subordinate to the Prior Liens and which will be entitled to super-priority administrative status (the "Loan Facility"). The ability to obtain sufficient working capital and liquidity through the Loan Facility is vital to the preservation and maximization of the value of CGH's assets and to successfully adjust CGH's debts.

33. CGH intends to file a Motion seeking an order from this Court authorizing CGH to enter into the Loan Facility with FNB because CGH needs additional financing due to fluctuations

10

in cash flow that are typical in its business and industry. The Loan Facility is necessary to the operations of CGH in this Case, accordingly, the Loan Facility pursuant to the Financing Order is in the best interests of CGH, and therefore, the community it serves. The proposed Loan Facility will fund a portion of the necessary restructuring costs and other essential costs as CGH moves toward confirmation of its plan. These costs include, inter alia, CGH's operating expenses, professional fees, insurance, taxes, and other miscellaneous costs.

34. As a result of, among other things, CGH's financial condition and pre-petition capital structure and the state of credit markets in general, CGH has been unable to obtain other sources of cash or credit in the form of unsecured credit allowable as an administrative. Financing on a post-petition basis is not otherwise available without CGH's granting FNB claims having priority over any and all administrative expenses and securing such indebtedness and obligations with the security interests in and the liens upon the property described below.

35. CGH believes the terms of the Loan Facility discussed below are fair and reasonable under the circumstances, reflect the exercise of prudent business judgment by CGH consistent with its duties as the CGH in this Chapter 9 Case and are supported by reasonably equivalent value and fair consideration. CGH believes that the Loan Facility will give it the necessary liquidity it needs to operate its business while pursuing confirmation of a plan of adjustment in order to maximize the value of its business and continue providing quality health care to the community. The Loan Facility will minimize disruption of the businesses and operations of CGH and permit CGH to meet payroll and other operating expenses, obtain needed supplies and maintain the going concern value of its business by demonstrating an ability to maintain normal operations. The Loan Facility should be approved because the credit acquired is

of significant benefit to CGH and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of CGH to obtain comparable credit elsewhere.

### Patient Care Ombudsman

36. Bankruptcy Code provides that within 30 days of the filing of a bankruptcy case a bankruptcy court order the appointment of an "ombudsman to monitor the quality of patient care and to represent the interests of the patients" of a healthcare business. Clearly, CGH is a healthcare business and will be filing a motion seeking a determination that no ombudsman need be appointed in the case.

37. As I understand it, the Bankruptcy Code sets forth the general duties of an ombudsman to include (i) monitoring the quality of patient care, including interviewing patients and physicians; (ii) filing reports with the bankruptcy court every 60 days regarding the quality of patient care provided to patients; and (iii) alerting the bankruptcy court if the quality of patient care is "declining significantly or is otherwise being materially compromised.

38. CGH's case was not caused by inadequate patient care or to avoid a multitude of medical malpractice claims of patients. Moreover, this case was not caused by a precipitous loss of medical staff or qualified individuals who provide health care services to CGH's patients. Quality patient care is of the highest priority to CGH and it intends to comply with regulatory and ethical obligations regarding patient care notwithstanding the filing of this Chapter 9 case. CGH submits that the appointment of an ombudsman is not necessary for the protection of its patients.

39. *Presence and Role of Licensing and Supervising Entities.* CGH is fully licensed by the State of Oklahoma. As part of the licensing procedure, CGH is subject to stringent guidelines, strict oversight, and frequent inspections. CGH has been and will continue to be in full compliance with the requirements set forth by the State of Oklahoma and all other regulatory

agencies. CGH complies with the Oklahoma licensure of hospitals as required by Okla. Stat. tit. 63, § 1-701 et seq., the Medicare Certification of Hospitals required by the Social Security Act and Code of Federal Regulations, among other regulations.

40.  *CGH's Past History of Patient Care.*  CGH has no history of providing substandard care to its patients, and is in full compliance with all applicable regulations and is not subject to any material deficiencies. Indeed, the Oklahoma State Department of Health has for the last two years recognized CGH as a Certified Healthy Business and this year honored the CGH with the highest level of recognition with an Excellence Certification

41.  *Internal Safeguards to Ensure Appropriate Level of Care.*  CGH's management team ensures patient complaints are being heard and acted upon, if necessary. In addition, CGH maintains staff personnel specifically tasked with implementing and monitoring CGH's health care services to patients and who will be tasked with dealing with and remedying all patient complaints. Finally, CGH participates in the Press Gainey[3] patient satisfaction survey process. Its Press Gainey patient satisfaction scores for the past three years show that CGH has consistently ranked with the very best hospitals in the country with regard to patient satisfaction.

42.  *Effect and Cost of Appointing Ombudsman.* CGH operates a rural hospital in a town with approximately 5,000 residents. Many of these residents have little, if any, familiarity with what an ombudsman does in relation to his or her appointment in a bankruptcy case. Although the appointment of an Ombudsman is a prophylactic measure to prevent substandard health care services, the perception from the community will no doubt be that an ombudsman has been appointed because of substandard heath care services. CGH's revenue is derived in large part on its

---

[3] The Press Gainey evaluation process is unrivalled as the gold standard in the healthcare industry, and has been recognized as such for three decades. (See, pressgainey.com, "About Us").

reputation in the community and unnecessarily appointing an ombudsman could have dire financial consequences for CGH. In addition, the cost of an ombudsman is a concern in this case.

43. I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 4, 2015.

*/s/ Herb Crum*
Herb Crum

# HERBERT F. CRUM, JR., CPA, CHFP

4784 Cedar Ridge Dr., Springdale, AR 72764 501-425-8586 • E-mail: hfcrum@sbcglobal.net

## CAREER SUMMARY

Successful **Hospital Accounting Professional** with progressive management and leadership experience. Major skills and accomplishments in areas of cost containment, revenue generation, productivity enhancement, information systems implementation, Revenue Cycle Management and quality improvement. **Strengths include accounting acumen, excellent communications skills, high level of organizational skills, belief in people and teamwork with a solid commitment to excellence.** A financial and technology trained professional with exceptional skills in analytical decision making coupled with the ability to develop a collaborative work environment focused on organizational goals.

## PROFESSIONAL EXPERIENCE

**PHYSICIANS' SPECIALTY HOSPITAL**, CFO, Fayetteville, AR
**July 2009 to October 2013**

Developed team oriented approach to newly formed healthcare organization. Annual net revenues of $30,000 generated by the facility. Progressed from a substantial initial year loss, to a second year loss reduction of 50 percent to a third year profit. Through team development and improving software implementation and use, reduced AR days from 100+ days to 45 days. Worked with financial institutions to restructure debt resulting in significant improvements in the Balance Sheet and debt structure.

**ARKANSAS SURGICAL HOSPITAL**, CFO, NORTH LITTLE ROCK, AR
**April 2008 TO April 2009**

Member of the Leadership Team with responsibility for strategic planning, goal setting, performance monitoring and business development. Administrative responsibilities included Financial Services, Patient Financial Services, Health Information Management, Materials Management and Information Technology, Facilities Management and Food Services for this 51 bed surgical hospital.

- Managed a $30,000,000 construction financing for expansion project.
- Led the organization through the transition to a new CEO by sharing the duties for CEO during                      search and employment of a new CEO.
- Reduced Days of Revenue in Accounts Receivable from approximately 59 to 43.
- Implemented inventory and accounting processes and controls resulting in a reduction in inventory variances to less than 1% of inventory value.
- Coordinated project for developing contract modeling of major payer contracts. Modeling is to be utilized in evaluation and negotiation for current and future contracts.
- Significantly improved communications with the Board of Directors related to Administrative and Financial Reporting.


EXHIBIT "A"

**PORTERFIELD KILLINGSWORTH, CPA,** HARRISON, AR
**NOVEMBER 2007 TO APRIL 2008**

Responsibilities included auditing, preparation of clients' financial statements, management consulting, and individual and corporate tax return preparation.

**ST. ANTHONY'S MEDICAL CENTER, CFO,** MORRILTON, AR

**FEBRUARY 2005 TO APRIL 2007**

Member of the executive team with responsibility for strategic planning, goal setting, performance monitoring and business development. Administrative responsibilities included Financial Services, Patient Financial Services, Health Information Management, Materials Management and Information Technology for a 23 bed Critical Access Facility that is part of Catholic Health Initiatives, a nationwide healthcare organization of approximately 73 facilities.

- Transitioned accounting systems from a primarily paper process to an automated financial system resulting in more timely and accurate reporting
- Directed the team responsible for implementation of corporate standard IT including ERP; provided consistency in data reporting and institutional savings by eliminating duplication of hardware and software
- Developed a participative budgeting process including variance reporting and analysis; department managers had more ownership and responsibility leading to better use of resources
- Led the organization through a change to Critical Access status, a federal designation requiring modified reporting and accounting; resulted in increasing federal reimbursement for services
- Negotiated contracts with health insurance providers obtaining rates that were at least as advantageous as previous contracts despite the trend toward reduction in reimbursement
- Ensured compliance with Federal and State regulations as well as corporate policies thus limiting exposure to penalties and fines

**SELF-EMPLOYED**
    **2004 TO 2005**

*Consultant*
Performed consulting and accounting services on a contractual basis.
Includes December 2004 – February 2005 interim CFO of St. Anthony's Medical Center, Morrilton, AR.

**YOAKUM COMMUNITY HOSPITAL, CFO,** YOAKUM, TX
FEBRUARY 2002 TO JULY 2004

Directed Financial Services, Patient Financial Services, Health Information Management, Materials Management and Information Technology. Oversaw financial management, preparations of financial statements, Board of Directors presentations, cash management, coordination of audits and preparation of annual federal cost report data for this 25 bed Critical Access Facility.
- Improved timeliness and accuracy of reporting which provided needed data for decision making
- Facilitated movement of accounts receivable and collections functions to a centralized business office structure resulting in elimination of redundant functions and systems

**SELF-EMPLOYED,** MOUNTAIN HOME, AR
**2001 TO 2002**

*Consultant*
Performed financial, consulting, and accounting services for healthcare organizations. Consulting clients included Ashdown Memorial Hospital and serving as interim Chief Financial Officer for Siloam Springs Memorial Hospital from July 2001 - September 2002.

**ST. BERNARD'S BEHAVIORAL CENTER,** JONESBORO, AR
**2000 TO 2001**

*Controller*
Provided financial reporting, General Accounting, Payroll, Information systems, and Business Office functions for this 60 bed psychiatric facility that is affiliated with 375 bed St. Bernard Regional Medical Center.

**BAXTER REGIONAL MEDICAL CENTER,** MOUNTAIN, AR
**1984 TO 2000**

*Controller*
Administrative responsibility for Accounting and Information Systems for this 268 bed General Acute Care Hospital. Reported to the CFO.
- Developed accounting staff that was highly regarded by the organization, as well as outside organizations, due to accuracy, timeliness, efficiency, and compliance
- Created a user driven Information Technology plan resulting in meeting a comprehensive set of goals and objectives
- Developed a talented and responsive staff of customer service oriented IT specialists
- Lead implementation of Hospital Information System and technology infrastructure
- Responsible for entire Y2K plan resulting in no Y2K problems

**OUACHITA COUNTY HOSPITAL,** CAMDEN, AR
      **1982 TO 1984**

*Business Office Manager*
Performed managerial duties and assisted the CFO.
  Reorganized the Billing and Collection functions resulting in a reduction in Accounts Receivable
- Established a hospital owned and managed collection agency
- Assisted in the installation of new hardware and software as well as working with programmers in      difying existing code and writing specialized programs resulting in the development of a variety of management reporting and analysis tools

## EDUCATION
BBA, Accounting, Southern Arkansas University, Magnolia, AR 1984

### PROFESSIONAL DEVELOPMENT
Numerous programs, conferences and seminars including Leadership, GAAP, HIPAA, Compliance, Quality Improvement, Customer Service, Technology, and Regulatory Issues

*Adjunct Faculty (part-time)* **ARKANSAS STATE UNIVERSITY AT MOUNTAIN HOME,**
      **1997 – 1998**
Instructor for "Introduction to Computers" course.
Word, Excel, Power Point, Access, IBM AS400

### PROFESSIONAL ORGANIZATIONS
Fellow - Health Care Financial Management Association

### ACTIVITIES/ORGANIZATIONS

Community service through various organizations including:

- Volunteer Business Manager - Mountain Home Christian Medical Clinic
- Chair - IT Committee of the Mountain Home School District
- Mentor - Alternative High School
- Business Department Advisory Board Member for High School
- Assistant Scout Leader for Troop 156