IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

In re:                                          )
                                                )
CRAIG COUNTY HOSPITAL AUTHORITY, )   Case No. 15-10277
a Public Trust,                                 )   Chapter 9
                                                )
         Debtor.                                )

### DECLARATION OF J. BILL KOEHLER
### IN SUPPORT OF CRAIG COUNTY HOSPITAL
### AUTHORITY'S STATEMENT OF QUALIFICATIONS
### PURSUANT TO SECTION 109(c) OF THE BANKRUPTCY CODE

I, J. Bill Koehler, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. That I am employed as a professional by Craig County Hospital Authority, an Oklahoma Public Trust, d/b/a Craig General Hospital ("CGH" or the "Hospital") as Bankruptcy Financial Advisor.

2. CGH has filed its Statement of Qualifications Pursuant to § 109(c) of the Bankruptcy Code certifying that CGH satisfies each of the criteria set forth in § 109(c) of title 11 of the United States Code (the "Bankruptcy Code") for determining its eligibility to be a CGH under chapter 9 of the Bankruptcy Code which includes a Memorandum of Law in Support of Statement of Qualifications Pursuant to § 109(c) of the Bankruptcy Code (the "Statement of Qualifications and the Memorandum of Law"). This Declaration is made in support of the Statement of Qualifications and the Memorandum of Law.

3. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge and information derived from my employment with CGH that are described

1

below. I am over 21 years of age, and I would be competent to testify to the facts set forth herein.

### Education and Experience

4. I am a principal with Koehler & Associates, Inc. ("Koehler") which maintains its offices at 6202 South Lewis Avenue, Suite F, Tulsa, Oklahoma 74136. Except as otherwise indicated, I have personal knowledge of the matters set forth below and, if called as a witness, would testify competently thereto.

5. To the best of my knowledge, information and belief, I am well-qualified in restructuring accounting matters because I am experienced in bankruptcy accounting matters and general debtor and creditor matters, and have previously served as president and chief executive officer of chapter 11 debtors that confirmed plans of reorganization. I have also assisted other chapter 11 debtors in their reorganization efforts as well as serving as a receiver in various state court receivership matters.

### Craig General Hospital

6. Craig County, in 1963, established Craig General Hospital as a county hospital pursuant to Title 19 Chapter 17 of the Oklahoma Statutes. In June of 1993, a trust indenture creating the Craig County Hospital Authority established a public trust to operate Craig General Hospital and all its associated activities. As such, CGH is a statutorily authorized municipal trust under applicable Oklahoma law. The Craig County Commissioners thereupon leased the hospital real estate, buildings and all associated facilities to the Public Trust for a nominal, annual consideration. Since then the Craig County Hospital Authority Public Trust has expanded operations through bond issues and other debt undertakings, constructing, among other things, a new physicians medical office building adjacent to the hospital, a new outpatient and birthing suite

addition to the main hospital building, and outpatient clinics at Miami, Welch, Langley and Monkey Island, thereby greatly enhancing CGH's ability to meet the health care needs of the residents of Craig and adjacent counties.

7. I understand that CGH is authorized to file this Voluntary Petition under Chapter 9 of the Bankruptcy Code by the relevant Oklahoma statutes: 62 Okl.Stat. §§282 and 283.

8. The Hospital operates a 24-hour emergency department which receives approximately 10,050 annual visits. The Hospital also offers a number of other healthcare services, including surgery services, rehabilitation services, mental health services, birthing services and acute care.

9. The Hospital has 62 licensed hospital beds, employs approximately 330 people and admits approximately 2,354 patients annually. Its' annual payroll is approximately $10,000,000.00.

10. The Hospital has 10 doctors on regular medical staff and is served by more than 20 visiting physicians representing a number of specialties.

## Genesis of Need for Financial Reorganization

11. Based upon my review and analysis of CGH's financial records, CGH is generally not paying its debts as they become due because it does not have the financial ability to do so. CGH owes unsecured trade debts in excess of $1,400,000, of which more than 40% is 60 days or more past due, plus the claims of Oklahoma Public Employee Retirement System ("OPERS").

12. CGH desires to implement a plan to adjust its debts. CGH attempted to negotiate with OPERS prior to filing its petition, but such attempt was futile as OPERS stated it had no statutory authority to negotiate a reduction in its claim. Due to the number and disparate interest

of the general unsecured creditors, CGH determined that it was impractical to attempt to negotiate reductions with the body of general unsecured creditors. CGH has and continues to diligently pursue efforts confirm and implement a Chapter 9 Plan. I have prepared a detailed financial analysis of the proposed Chapter 9 Plan and in my opinion CGH's operations will be economically feasible after adjustment of its debts.

## Oklahoma Public Employees Retirement System Costs

13. I understand that CGH's operating room was temporarily closed due to certain non-compliance issues that have now been remedied so that the operating room is once again operational. This temporary closure caused a significant overall decrease in revenue because it had a negative impact on other services in addition to income derived from operating rooms services. As CGH undertook to deal with these unexpected revenue crises, it faced an ever increasing, payroll cost burden relative to its income by reason of its participation in the OPERS. The OPERS retirement system, for all employees who began service on or before December 5, 2014, is effectively a "defined benefit" program that has become ruinously expensive with ever increasing employer contributions mandated over the past two decades. Presently, CGH's obligation to OPERS is 11.5 percent of each participating employee's gross payroll, a figure approximately three times the cost of an equivalent defined contribution (e.g. 401K or 403(b)) type program. Unlike cities and municipalities that can raise taxes to meet such costs, CGH receives no tax revenue whatever. (CGH is the only Oklahoma hospital authority that still participates in OPERS.) Simply stated, the cost of continuing participation in OPERS would likely result in a reduction in health care services and ultimately force CGH to close its doors. A key component of the reorganization plan that CGH intends to propose its withdrawal from OPERS.

14. CGH estimates that it owes approximately $3,000,000.00 to OPERS, and does not have the ability to pay the present value of its debt to OPERS within a reasonable time period. The actual amount of the claim held by OPERS requires an actuarial analysis which OPERS has demanded CGH pay approximately $25,000 in advance. CGH declined to pay OPERS to determine the amount of its unsecured, non-priority claim. As such, the actual amount of OPERS' claim is believed to be unliquidated and disputed as of the Petition Date.

15. The negotiations with the OPERS were unsuccessful and indeed are in fact impractical because Joe Fox, general counsel and acting director of OPERS advised CGH's counsel that "OPERS does not have the authority to accept less than the actuarially required amount to withdraw from the plan. The acceptance of any amount less than what is owed would place OPERS in the position of paying a large portion of the expense of all current and future (vested) retirees from the Hospital. I do not think OPERS has any ability or authority to accept this financial burden which by law has been placed on the participating employer."

16. Consequently, as shown above further negotiations with OPERS are futile and impractical. To further illustrate the difficulties with OPERS, CGH recently received a written demand from OPERS asserting that the Hospital must not only pay the claim to OPERS in full, but must do so before OPERS will recognize the Hospital's withdrawal from the OPERS retirement system. As a practical matter OPERS demands payment in full in cash of its entire claim plus ongoing claims for contributions of funds until such is paid. It is critical to the economic viability of CGH that it exit the OPERS retirement system and deal with the estimated $3,000,000 claim arising from such exit by means of the relief afforded under Chapter 9. CGH has no other realistic

option but to seek relief pursuant to Chapter 9 so that it has the authority to treat the $3,000,000 claim as provided under the provisions of Chapter 9.

## Negotiations With Other Creditors

17. CGH has 572 unsecured creditors holding claims in excess of $1,400,000[1] the largest of which is approximately $275,000. It is impracticable to negotiate with such a large group for whom there is no natural representative capable of bargaining on their behalf.

18. CGH has negotiated with the First National Bank of Vinita ("FNB") and has reached an agreement to modify the terms of its existing loan consistent with the Chapter 9 Plan CGH intends to file. In addition, FNB has agreed to loan CGH up to $600,000 as a post-petition line of credit to facilitate a successful reorganization.

## Attempts to Address Financial Crisis Prior to Consideration of Bankruptcy Petition

19. CGH closed on the sale of small apartment complex that it owned shortly before the Petition Date. The property was sold to Toni Stanley, an unrelated third party, for $430,000.00, an amount in excess of its appraised value and together with escrowed funds was sufficient to fully retire the mortgage encumbering the property. This debt was the only bond indenture of CGH and was administered by the Bank of Oklahoma.

20. The hospital has taken significant cost cutting measures consistent with continuation of efficient, safe and high quality patient care, has publicly committed that it will meet the health care needs of its northeast Oklahoma community without interruption, and promised that CGH employees will not see any disruption of their paychecks or health insurance coverage. To attain these goals the Hospital Trustees, who are appointed by The Craig County

---

[1] This amount does not include the OPERS claims, but if such are included, then the total unsecured claims approach $5,000,000.00.

Commissioners and who serve without pay and are responsible for balancing financial decisions with community concerns, have directed management to take every action necessary to seek relief for CGH under Chapter 9 of the Bankruptcy Code.

## CGH's SECURED DEBT

21.    CGH is indebted to FNB in the approximate amount of $1,529,233.00 pursuant to certain documents executed and delivered to Lender by CGH, including, without limitation, that certain Promissory Note dated August 14, 2009 and certain real property mortgages related thereto (as heretofore amended and supplemented from time to time, the "FNB Credit Agreement"). The FNB Credit Agreement was originally between the Oklahoma State Bank ("OSB") and CGH, however the FNB has acquired FNB Credit Agreement from OSB.   FNB claims a first in priority real property mortgage upon real property of CGH located in Langley and Vinita, Oklahoma (the "FNB Pre-Petition Collateral").

22.    The FNB Credit Agreement, and all notes, security agreements, assignments, pledges, mortgages, deeds of trust, guaranties, forbearance agreements, letters of credit, and other instruments or documents executed in connection therewith or related thereto are referred to herein collectively as the "Pre-Petition Claim Documents."

23.    CGH is also are indebted to SpiritBank, an Oklahoma Banking Corporation ("SpiritBank") in the approximate amount of $950,000.00 pursuant to certain documents executed and delivered to SpiritBank by CGH including, without limitation, the Commercial Loan Agreement dated May 28th, 2009 (the "SpiritBank Loan Agreement") and the related notes, real property mortgage and other agreements as each may have been heretofore amended and supplemented from time to time, the "SpiritBank Credit Agreement").   SpiritBank claims a first

in priority real property mortgage upon real property of CGH located in Miami, Oklahoma where there is a medical office building.

24.     CGH is also are indebted to Arvest Bank, an Oklahoma Banking Corporation ("Arvest") in the approximate amount of $1,772,825.00 pursuant to certain documents executed and delivered to Arvest by CGH including, without limitation, a promissory note and mortgage dated October 14, 2013 (the "Arvest Loan Agreement") and the related agreements as each may have been heretofore amended and supplemented from time to time, (the "Arvest Credit Agreement").  Arvest claims a first in priority real property mortgage upon real property of CGH located on Monkey Island at Grand Lake which is in Delaware County, Oklahoma where CGH operates a medical clinic.

25.     CGH is also indebted to several equipment finance companies for purchase money lease/financing agreements in the approximately amount of $750,000.00 (collectively, the "Equipment Leases").  As of the Petition Date, CGH was not in default on its obligations to FNB, SpiritBank, Arvest and the Equipment Leases.

26.     Pursuant to the FNB Credit Agreement and applicable law, FNB holds a valid, enforceable, and allowable claim against CGH, as of the Petition Date, as stated above plus any and all other interest, fees, costs, expenses, charges, and other claims, debts, or obligations of CGH to FNB that have accrued as of the Petition Date under the FNB Credit Agreement and applicable law.  FNB's claim as described in the preceding sentence together with all post-Petition Date interest, fees, costs, and charges allowed to FNB on such claim pursuant to Bankruptcy Code § 506(b) are collectively referred to hereunder as the "FNB Pre-Petition Claim".

27.     CGH believes that the FNB Pre-Petition Claim constitutes a valid obligation.

Subject only to the Prior Liens (as defined below), the FNB Pre-Petition Claim is secured by properly perfected first priority liens upon and security interests in the FNB Pre-Petition Collateral (the "Pre-Petition Collateral").

28.     The security interests and liens of FNB do not have priority over any other valid, perfected and unavoidable liens and security interests of any other secured creditor in any assets of CGH existing on the Petition Date that are senior in priority under applicable law to FNB's liens and security interests granted under the Loan Agreement in the Pre-Petition Collateral such as the liens held by SpiritBank, Arvest Bank and the Equipment Leases (collectively, the "Prior Liens").

### Post-Petition Loan

29.     CGH does not have sufficient available sources of working capital or cash to continue the operation of its business in this chapter 9 case. As stated above, CGH has negotiated a post-petition loan agreement with FNB for a line of credit of up to $600,000 to be secured by a lien that is subordinate to the Prior Liens and which will be entitled to super-priority administrative status (the "Loan Facility"). The ability to obtain sufficient working capital and liquidity through the Loan Facility is vital to the preservation and maximization of the value of CGH's assets and to successfully adjust CGH's debts.

30.     CGH intends to file a Motion seeking an order from this Court authorizing CGH to enter into the Loan Facility with FNB because CGH needs additional financing due to fluctuations in cash flow that are typical in its business and industry. The Loan Facility is necessary to the operations of CGH in this Case. Accordingly, the Loan Facility pursuant to the Financing Order is in the best interests of CGH, and therefore, the community it serves. The proposed Loan Facility will fund a portion of the necessary restructuring costs and other essential costs as CGH

moves toward confirmation of its plan. These costs include, inter alia, CGH's operating expenses, professional fees, insurance, taxes, and other miscellaneous costs.

31. As a result of, among other things, CGH's financial condition and pre-petition capital structure and the state of credit markets in general, CGH has been unable to obtain other sources of cash or credit in the form of unsecured credit allowable as an administrative expense. Financing on a post-petition basis is not otherwise available without CGH's granting FNB claims having priority over any and all administrative expenses and securing such indebtedness and obligations with the security interests in and the liens upon the property described below.

32. I have been involved in the negotiations with FNB on the Loan Facility including review of the loan documents for the same. In my opinion the terms of the Loan Facility discussed herein are fair and reasonable under the circumstances, reflect the exercise of prudent business judgment by CGH consistent with its duties in this Chapter 9 Case and are supported by reasonably equivalent value and fair consideration. In my opinion the Loan Facility will give CGH the necessary liquidity it needs to operate its business while pursuing confirmation of a plan of adjustment in order to maximize the value of its business and continue providing quality health care to the community. The Loan Facility will minimize disruption of the businesses and operations of CGH and permit CGH to meet payroll and other operating expenses, obtain needed supplies and maintain the going concern value of its business by demonstrating the ability to maintain normal operations and continue providing quality health care.

33. I contacted Arvest Bank, Oklahoma State Bank and First National Bank of Vinita regarding their willingness to consider an unsecured loan similar in amount to the Loan Facility. None of these Banks were willing to consider making a loan similar in amount to the Loan Facility

on an unsecured basis. The FNB Loan Facility should be approved because the funds to be provided are of significant benefit to CGH and the terms and conditions of the proposed loan are reasonable and competitive in the market place of post petition loans.

34.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 2, 2015.

_____
J. Bill Koehler