# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OKLAHOMA

IN RE:                     )
                            )     **Case No. 15-10277-M**
**Craig County Hospital Authority,** )     **Chapter 9**
**an Oklahoma Public Trust,**    )
                            )
           **Debtor.**       )

## MOTION FOR FINAL ORDER (A) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING, (B) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS TO LENDER AND (C) GRANTING RELATED RELIEF

**Craig County Hospital Authority**, **an Oklahoma Public Trust,** the Debtor herein ("Debtor") files this *Motion for a Final Order (A) Authorizing the Debtor to Obtain Post-Petition Credit, (B) Granting Security Interests and Superpriority Administrative Expense Status to Lender, and (C) Granting Related Relief* (the "Motion") and in support thereof, respectfully states as follows:

### JURISDICTION, VENUE AND PROCEDURAL BACKGROUND

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     On the 25th day of February, 2015, (the "Petition Date") Debtor filed a Petition for Relief under chapter 9 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Oklahoma (the "Court").  No party in interest has requested the dismissal of this case (the "Case") and no committee of unsecured creditors (the "Committee") has been appointed at this time.

4.     Since the Petition Date, the Debtor has continued to operate its business and manage its property as Debtor pursuant to §§901 *et seq.* of the Bankruptcy Code.[1]

5.     A description of the Debtor's business, the reasons for filing the Case, and the relief sought from this Court to allow for a smooth transition into operations under chapter 9 is set forth in the First Day Declarations of Herb Crum and J. Bill Koehler, which have been filed in this case [Dockets No. 10 and 11].  The Debtor hereby adopts and incorporates the First Day Declarations as if fully set forth herein.

## RELIEF REQUESTED

6.     By this Motion, the Debtor requests, *inter alia*, entry of a final Financing Order (the "Financing Order") in substantially the form attached hereto as **Exhibit A** pursuant to §§ 361, 362 and 364 of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"):

  a.  authorizing the Debtor to obtain post-petition loans and other extensions of credit from First National Bank, Vinita, Oklahoma ("Lender") in an amount not to exceed $600,000.00, subject to certain automatic reduction feature to $500,000.00 and annual review provisions on a final basis (the "Loan Commitment"), and including, without limitation, principal, other extensions of credit and financial accommodations, interest, fees, expenses, and other costs of Lender in the Case, in accordance with the terms and conditions set forth herein and in the attached Secured Super-Priority Credit Agreement (the "Loan Agreement"),[2] the other Loan Documents (as defined in the Loan Agreement), and all other related agreements and documents (collectively, the "Loan Facility");

  b.  authorizing the Debtor to execute, deliver, and perform under the Loan Facility and Loan Documents, and all other related agreements and documents creating, evidencing, or securing indebtedness or obligations of the Debtor to Lender on account of the Loan Facility or granting or perfecting liens or

---

[1] All references to sections or codes, unless otherwise noted, are made to the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* and referred to herein as the "Bankruptcy Code."

[2] A copy of the Loan Agreement is attached hereto as **Exhibit B**, and incorporated herein by reference.

security interests by the Debtor in favor of and for the benefit of Lender on account of the Loan Facility, as same now exists or may hereafter be amended, modified, supplemented, ratified, assumed, extended, renewed, restated, or replaced, and any and all of the agreements and documents currently executed or to be executed in connection therewith or related thereto, by and among the Debtor and Lender, the terms of which are referenced and incorporated herein (collectively, the "Loan Facility Documents");

c.  approving the terms and conditions of the Loan Facility and the Loan Facility Documents;

d.  modifying the automatic stay of Bankruptcy Code § 362 (the "Automatic Stay") to the extent provided in the Financing Order;

e.  scheduling a final hearing (the "Final Hearing") to consider entry of the Financing Order.

**Statement in Compliance with Bankruptcy Rule 4001(b) and (c)**

7.  In compliance with Bankruptcy Rule 4001(b) and (c), the Debtor makes the following concise statement about the relief requested herein:[3]

a.  Parties: The Debtor will be a borrower under the Loan Facility. Lender will be Lender under the Loan Facility.

b.  Facility Amount:  Not to exceed at any time the aggregate principal amount of $600,000, subject to an automatic reduction feature to $500,000 and annual review by the Lender.  [**Exh. B**, Loan Agreement, § 2.1 and 2.5]

c.  Termination Date:  Earlier of the occurrence of an Event of Default (as defined in the Financing Order) or February 28, 2020, subject to the annual review by the Lender.  [**Exh. B**, Loan Agreement, § 2.1and 2.2]

d.  Interest Rate: The Applicable Prime Rate (as defined in the Loan Agreement) plus three hundred basis points (3.00%).  [**Exh. B**, Loan Agreement, § 2.3]

e.  Restrictions on Availability of Financing Advances.  (i) The maximum amount of borrowings as set forth in the Financing Order and the Loan

---

[3] This statement is a summary of certain terms and conditions set forth in the Loan Agreement and the Financing Order.  Parties in interest should review the Financing Order attached hereto as **Exhibit A**. Reference is made to the Loan Agreement and the Financing Order for a full and complete description of the Loan Facility.  To the extent this statement is inconsistent with the Loan Agreement and/or the Financing Order, the Loan Agreement and the Financing Order shall control.  Capitalized terms not otherwise defined in this statement shall be given the meaning ascribed to them in the body of the Motion.

Agreement and (ii) the meeting of conditions precedent set forth in Sections 4.1 and 4.2 of the Loan Agreement.

f.  <u>Collateral and Security</u>:

    i.  Lender will be granted first priority claims, liens and security interests in any and all assets and properties of the Debtor, now owned or after acquired, real and personal, and the proceeds and products thereof (collectively, the "<u>Collateral</u>,") to secure the Loan Facility, senior to all other liens and security interests, including adequate protection and replacement liens granted pursuant to the terms of the Financing Order, to secure all obligations under the Loan Facility (the "<u>Loan Obligations</u>") (and including, without limitation, principal and any other extensions of credit, interest, fees, expenses, and any fees and expenses of Lender in the Case, however incurred), but subject only to Prior Liens (if any) and the Carve-Out (as defined below). The Collateral does not include any causes of action under Bankruptcy Code § 544, 547, and 548. [**<u>Exh. A</u>**, Financing Order, ¶¶ 18-29].

    ii.  Lender will be granted superpriority administrative claims and all other benefits and protections allowable under Bankruptcy Code §§ 507(a)(2) and 503(b)(1), senior in right to all other administrative claims against the Debtor, except for the Carve-Out. [**<u>Exh. A</u>**, Financing Order, ¶ 20].

g.  <u>Event of Default/Termination</u>:  As is customary for this type of credit facility. [**<u>Exh. B</u>**, Loan Agreement, § 7.1].

h.  <u>Purpose for and Duration of Loan Facility</u>:

    i.  To maintain the Debtor's assets, operate its business, provide financial information, and pay employee compensation, payroll taxes, overhead, and other expenses necessary to maximize the value of the Debtor and to file and obtain confirmation of a plan.  [**<u>Exh. A</u>**, Financing Order, ¶¶ 35-37]

    ii.  Lender's consent commitment to provide credit under the Loan Agreement and the Financing Order, subject to the funding limitations therein, will be effective upon entry of the Financing Order to and including the earlier of: (a) notice of the occurrence of an Event of Default or (b) subject to Lender's annual review rights, February 28 2020, at which time all of the Debtor's authority to obtain credit under the Loan Agreement and the Financing Order will terminate, as will Lender's obligation to continue funding the Loan Facility, unless extended by written agreement of the parties hereto. [**<u>Exh. A</u>**, Financing Order, ¶ 64]

i.  <u>Carve-Out</u>.

    i. Lender consents, subject to the terms and conditions set forth in the Financing Order, to a carve out from its Collateral for the payment of (i) reasonable fees and expenses approved by the Court pursuant to §943(b)(3) of all professionals hired by the Debtor or who otherwise seek to be paid by the Debtor as a part of this case (the "Case Professionals") (ii) an aggregate amount not to exceed $30,000.00 to be used to pay fees earned and expenses by counsel for the Committee (if any) (collectively, the "Carve-Out"). [**Exh. A**, Financing Order, ¶ 38 - 41]

  j. <u>No Surcharge; Marshaling Waiver; Release of Claims; Indemnity</u>.

    i. No costs or expenses of administration will be charged against Lender, its claims or the Collateral pursuant to Bankruptcy Code § 506(c) without the prior written consent of Lender.  Lender will not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral. [**Exh. A**, Financing Order, ¶ 42]

  k. <u>Other Material Terms</u>.

    i. Upon the occurrence of any Event of Default and without limitation to the other remedies set forth in the Financing Order, and, failure to pay within five (5) days (as to monetary payment defaults) and after the giving of thirty days' notice (for non-monetary defaults) by Lender, then without further act or action by Lender, or any further notice, hearing or order of this Court, the Automatic Stay will be immediately modified and Lender will be authorized, in its sole and absolute discretion, to take any and all actions and remedies that Lender may deem appropriate to proceed against, take possession of, protect, and realize upon the Collateral and any other property of the Debtor. [**Exh. A**, Financing Order, ¶ 43 - 46].

    ii. Lender will be provided access to information to the extent provided in the Financing Order. [**Exh. A**, Financing Order, ¶¶ 35-37].

## THE DEBTORS' SECURED DEBT

8.    The Debtor is indebted to Lender pursuant to certain documents executed and delivered to Lender by the Debtor, including, without limitation, that certain Promissory Note dated August 14, 2009 and certain real property mortgages related thereto (as heretofore amended and supplemented from time to time, the "Lender Credit Agreement"). The Lender Credit Agreement was originally between the Oklahoma State Bank ("OSB") and the Debtor,

however the Lender has acquired Lender Credit Agreement from OSB.  Lender claims a first in priority real property mortgage upon real property of the Debtor located in Langley and Vinita, Oklahoma (the "Lender Pre-Petition Collateral").

9.      The Lender Credit Agreement, and all notes, security agreements, assignments, pledges, mortgages, deeds of trust, guaranties, forbearance agreements, letters of credit, and other instruments or documents executed in connection therewith or related thereto are referred to herein collectively as the "Pre-Petition Claim Documents."

10.     The Debtor is also are indebted to SpiritBank, an Oklahoma Banking Corporation ("SpiritBank") pursuant to certain documents executed and delivered to SpiritBank by Debtor including, without limitation, the Commercial Loan Agreement dated May 28th, 2009 (the "SpiritBank Loan Agreement") and the related notes, real property mortgage and other agreements as each may have been heretofore amended and supplemented from time to time, the "SpiritBank Credit Agreement").  SpiritBank claims a first in priority real property mortgage upon real property of the Debtor located in Miami, Oklahoma.

11.     The Debtor is also are indebted to Arvest Bank, an Oklahoma Banking Corporation ("Arvest") in the approximate amount of $1,772,825.00 pursuant to certain documents executed and delivered to Arvest by the Debtor including, without limitation, a promissory note and mortgage dated October 14, 2013 (the "Arvest Loan Agreement") and the related agreements as each may have been heretofore amended and supplemented from time to time, (the "Arvest Credit Agreement").  Arvest claims a first in priority real property mortgage upon real property of the Debtor located on Monkey Island at Grand Lake which is in Delaware County, Oklahoma where the Debtor operates a medical clinic.

12.     The Debtor is also are indebted to several equipment finance companies listed below (collectively, the "Equipment Lessors") for purchase money lease/financing agreements in the approximate amount of $750,000.00 (collectively, the "Equipment Leases") as follows:

12.a.   VFI-SPV VIII Corp. a/k/a/ Varilease Finance, Inc. on a Master Lease Agreement dated March 4, 2014 with a balance as of the Petition date of approximately $453,084.

12.b.   Amerisourcebergen Drug Corporation on a lease for certain equipment and related supplies on a master lease dated April 1, 2009 with a balance as of the Petition Date of approximately $38,816.00.

12.c.   The Bank of American Fork, Utah  as assignee of TFG Leasing Fund III, LLC on a Master Lease Agreement dated April 29, 2013 with a balance as of the Petition Date of approximately $257,760.36.

13.     The Equipment Lessors have filed UCC-1 financing statements giving notice of possible lien claims upon equipment, accounts receivable and general intangibles owed by the Debtor but unrelated to the Equipment Leases however, the terms of the Equipment Leases do not purport to grant such liens (the "Notice Liens").  The Debtor alleges the Equipment Lessors do not hold any valid liens except for the purchase money liens upon the specific items of equipment that are the subject of the Equipment Leases.  Therefore, the Notice Liens are not included in the Prior Liens defined herein.

14.     Pursuant to the Lender Credit Agreement and applicable law, Lender holds a valid, enforceable, and allowable claim against the Debtor, as of the Petition Date, in an aggregate amount equal to at least $1,569,000.00 of unpaid principal, plus any and all other interest, fees, costs, expenses, charges, and other claims, debts, or obligations of the Debtor to

Lender that have accrued as of the Petition Date under the Lender Credit Agreement and applicable law.  Lender's claim as described in the preceding sentence together with all post-Petition Date interest, fees, costs, and charges allowed to Lender on such claim pursuant to Bankruptcy Code § 506(b) are collectively referred to hereunder as the "<u>Lender Pre-Petition Claim</u>".

15.    The Lender Pre-Petition Claim constitutes an allowed, legal, valid, binding, enforceable, and non-avoidable obligation of and claim against the Debtor, and is not subject to any offset, defense, counterclaim, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtor does not possess and cannot assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity, enforceability, allowance, and non-avoidability of the Lender Pre-Petition Claim.

16.    Subject only to the Prior Liens (as defined below), the Lender Pre-Petition Claim is secured by properly perfected first priority liens upon and security interests in, *inter alia*, the Lender Pre-Petition Collateral together with all substitutions, replacements, parts, accessories, supplies, improvements, additions, and accessions now or hereafter affixed thereto or used in connection therewith, and all proceeds and products thereof (the "<u>Pre-Petition Collateral</u>").

17.    Except for the Notice Liens, the security interests and liens of Lender do not have priority over any other valid, perfected and unavoidable liens and security interests of any other secured creditor in any assets of the Debtor existing on the Petition Date that are senior in priority under applicable law to Lender's liens and security interests granted under the Loan Agreement in the Pre-Petition Collateral (collectively, the "<u>Prior Liens</u>").  The Debtor and Lender reserve the right to object to the validity, priority, or extent of any asserted Prior Lien, or

the allowance of such debts secured thereby, or to institute any actions or adversary proceedings with respect thereto.

## RELIEF REQUESTED

### Introduction

18.     The Debtor does not have sufficient available sources of working capital or cash to continue the operation of its business in this chapter 9 case without access to the Loan Facility. The ability to obtain sufficient working capital and liquidity through the Loan Facility is vital to the preservation and maximization of the value of the Debtor's assets and to successfully adjust the Debtor's debts.

19.     By this Motion, the Debtor requests that this Court enter an order authorizing the Debtor to enter into the Loan Facility with Lender pursuant to Bankruptcy Code §§ 361, 362 and 364.

20.     The Debtor needs additional financing due to fluctuations in cash flow that are typical in its business and industry. The Loan Facility is necessary to the operations of the Debtor in this Case, accordingly, the Loan Facility pursuant to the Financing Order is in the best interests of the Debtor, and therefore, the community it serves.  The proposed Loan Facility will fund a portion of the necessary restructuring costs and other essential costs as the Debtor moves toward confirmation of its plan.  These costs include, *inter alia*, the Debtor's operating expenses, professional fees, insurance, taxes, and other miscellaneous costs.

### The Loan Facility Satisfies the Requirements of Bankruptcy Code § 364

21.     As a result of, among other things, the Debtor's financial condition and pre-petition capital structure and the state of credit markets in general, the Debtor has been unable to obtain other sources of cash or credit in the form of unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense pursuant to Bankruptcy Code § 364(a) or (b).

Financing on a post-petition basis is not otherwise available without the Debtor's granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), and securing such indebtedness and obligations with the security interests in and the liens upon the property described below pursuant to Bankruptcy Code § 364(c).

22.     The terms of the Loan Facility discussed below are fair and reasonable under the circumstances, reflect the exercise of prudent business judgment by the Debtor consistent with its duties as Debtor and are supported by reasonably equivalent value and fair consideration.  The Debtor believes that the Loan Facility will give it the necessary liquidity it needs to operate its business while pursuing confirmation of a plan of adjustment in order to maximize the value of its business and continue providing quality health care to the community.  The Loan Facility will minimize disruption of the businesses and operations of the Debtor and permit the Debtor to meet payroll and other operating expenses, obtain needed supplies and maintain the going concern value of its business by demonstrating an ability to maintain normal operations.  The Loan Facility should be approved under Bankruptcy Code § 364 because "the credit acquired is of significant benefit to the [Debtor] and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the Debtor to obtain comparable credit elsewhere."  *In re Aqua Associates*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).  The Debtor submits that it has met the requirements under Bankruptcy Code § 364 to obtain post-petition financing and that the Motion should be granted.

23.     The Debtor proposes and seeks through this Motion that upon entry of the Financing Order authorizing use of the Loan Facility, the Debtor may use the Loan Facility as set forth therein pursuant to the Loan Agreement and the Financing Order.

## HEARING

24.     The Debtor has filed a separate Application requesting that the Court enter an order that (i) fixes a date by which any objection to the entry of the Financing Order is required to be filed on or before 4:00 p.m. (the "Objection Date"), (ii) that the Court set a hearing on this Motion (the "Hearing") and (iii) sets forth the manner and means of notice for this Motion, the Objection Date and the Hearing pursuant to Bankruptcy Rule 4001 and the Local Rules.

## CONCLUSION

The Debtor respectfully requests that the Court enter the Financing Order (i) approving the terms of the Loan Facility on a final basis, (ii) approving and granting such measure of adequate protection as set forth therein, and (iii) granting any and other such further relief to which the Debtor may be justly entitled.

Dated: March 4, 2015

Respectfully submitted,

**CROWE & DUNLEVY**

*/s/ Mark A. Craige*
Mark A. Craige, OBA No. 1992
Michael R. Pacewicz, OBA No. 18794
500 Kennedy Building
321 South Boston Avenue
Tulsa, Oklahoma 74103-3313
918.592.9800 Telephone Number
918.592.9801 Facsimile Number
e-mail address:
mark.craige@crowedunlevy.com
michael.pacewicz@crowedunlevy.com

*Attorneys for Debtor*

## CERTIFICATE OF SERVICE

I certify that on March 4, 2015, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Eastern District of Oklahoma, and facsimile or overnight delivery to those parties listed, and as indicated, on the attached proposed Master Service List.

*/s/ Mark A. Craige*
One of Counsel

2677431.4

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Case No. 15-10277-M** |
| **Craig County Hospital Authority,** | ) | **Chapter 9** |
| **an Oklahoma Public Trust,** | ) | |
| | ) | |
| **Debtor.** | ) | |

**FINAL ORDER (A) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING, (B) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS TO LENDER AND (C) GRANTING RELATED RELIEF**

Now on this __ day of _____, 2015, the *Motion for a Final Order (A) Authorizing the Debtor to Obtain Post-Petition Credit, (B) Granting Security Interests and Superpriority Administrative Expense Status to Lender, and (C) Granting Related Relief* (the "Motion") filed by the above-captioned debtor, (the "Debtor"), seeking, *inter alia*, pursuant to Sections 362(d), 364(c) 503(b), and 507 of Title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the following:

(a)     authorizing the Debtor to obtain post-petition loans and other extensions of credit from First National Bank, Vinita, Oklahoma ("Lender") in an amount not to exceed $600,000.00 on a final basis (the "Loan Commitment"), and including, without limitation, principal, other extensions of credit and financial accommodations, interest, fees, expenses, and other costs of Lender in this Case[1], in accordance with the terms and conditions set forth herein and in the attached Secured Super-Priority Credit Agreement (the "Loan Agreement"),[2] the other Loan Documents (as defined in the Loan Agreement), and all other related agreements and documents (collectively, the "Loan Facility");

(b)     authorizing the Debtor to execute, deliver, and perform under the Loan Facility and Loan Documents, and all other related agreements and documents creating,

---

[1] Capitalized terms not defined herein shall be defined as set forth in the Motion or the Loan Agreement, as applicable.
[2] A copy of the Loan Agreement is attached hereto as **Exhibit 1**, and incorporated herein by reference.

EXHIBIT A

evidencing, or securing indebtedness or obligations of any of the Debtor to Lender on account of the Loan Facility or granting or perfecting liens or security interests by the Debtor in favor of and for the benefit of Lender on account of the Loan Facility, as same now exists or may hereafter be amended, modified, supplemented, ratified, assumed, extended, renewed, restated, or replaced, and any and all of the agreements and documents currently executed or to be executed in connection therewith or related thereto, by and among the Debtor and Lender, the terms of which are referenced and incorporated herein (collectively, the "Loan Facility Documents");

(c)     approving the terms and conditions of the Loan Facility and the Loan Facility Documents;

(d)     modifying the automatic stay of Bankruptcy Code § 362 (the "Automatic Stay") to the extent provided in the Financing Order;

1.     The Debtor and Lender have represented to this Court that they have agreed in good faith to the terms and conditions of the Loan Agreement and this *Final Order Authorizing The Debtor To Obtain Post-Petition Financing, (B) Granting Security Interests And Superpriority Administrative Expense Status To Lender, And (C) Granting Related Relief* (the "Financing Order"). The Debtor and the Lender have represented to the Court that they have negotiated at arm's length, have been represented by counsel, and have acted in good faith in the negotiation and preparation of the Loan Agreement and this Financing Order and intend to be and are bound by their respective terms.

2.     The Debtor and the Lender have stipulated and agreed as follows, and based upon the pleadings and evidence presented at hearing before this Court, this Court hereby acknowledges such stipulations, and grants the relief herein, on a final basis.  Therefore, consistent with Bankruptcy Code §§ 362, 363, 364, 503(b), and 507, this Court hereby finds and Orders:

## STATEMENT OF JURISDICTION AND VENUE

3.      This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B),(D),(G), (K), (M) and (O).

4.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## NOTICE

5.      Sufficient and adequate notice of the Motion and the hearing with respect thereto has been given pursuant to the order entered on March ___, 2015 [Doc. __], Bankruptcy Rules 2002, 4001, 9006, and 9014 and the Local Rules, and as required by Bankruptcy Code §§ 102, 105, 361, 362, 363, and 364.  No further notice of, or hearing on, the relief sought in the Motion is necessary.

## FACTUAL AND PROCEDURAL BACKGROUND

6.      On the 25th day of February, 2015 (the "Petition Date"), Debtor filed a Petition for Relief under chapter 9 of the United States Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the Northern District of Oklahoma (the "Court").  No party in interest has requested the dismissal of this case and no committee of unsecured creditors (the "Committee") has been appointed at this time.

7.      Since the Petition Date, the Debtor has continued to operate its business and manage its property as Debtor pursuant to §§901 *et seq*. of the Bankruptcy Code.

8.      A description of the Debtor's business, the reasons for filing the Case, and the relief sought from this Court to allow for a smooth transition into operations under chapter 9 is

set forth in the First Day Declarations of Herb Crum and J. Bill Koehler, which have been filed in this case [Dockets No. 10 and 11].

## **The Debtor's Stipulations**

9.      The Debtor stipulates that:

(i)     Pursuant to the Pre-Petition Claim Documents (as defined below) and applicable law, Lender holds a valid, enforceable, and allowable claim against the Debtor, as of the Petition Date, in an aggregate amount equal to at least $1,569,000.00 of unpaid principal, plus all interest, fees, costs, expenses, charges, and other claims, debts or obligations of the Debtor to Lender that have accrued as of the Petition Date under the Pre-Petition Claim Documents and applicable law.  The Lender's claim as described in the preceding sentence together with all post-Petition Date interest, fees, costs, and charges allowed to the Lender on such claim pursuant to Bankruptcy Code § 506(b) shall collectively be referred to hereunder as the "Lender Pre-Petition Claim."

(ii)    The Lender Pre-Petition Claim constitutes an allowed, legal, valid, binding, enforceable, and non-avoidable obligation of and claim against the Debtor and shall not be subject to any offset, defense, counterclaim, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtor does not possess and shall not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity, enforceability, allowance, and non-avoidability of the Lender Pre-Petition Claim.

(iii)   The Lender Pre-Petition Claim is evidenced by that certain Promissory Note dated August 14, 2009 and certain real property mortgages related thereto (as heretofore amended and supplemented from time to time, the "Credit Agreement").

(iv)    The Credit Agreement, and all notes, security agreements, assignments, pledges, mortgages, and other instruments or documents executed in connection therewith, related thereto, or otherwise evidencing or relating to indebtedness or obligations of the Debtor to Lender shall be referred to herein collectively as the "Pre-Petition Claim Documents."[3]  The Pre-Petition Claim Documents are genuine, valid, existing, legally enforceable and admissible in the Case for all purposes.

---

[3] True and correct copies of certain of the Pre-Petition Claim Documents are retained by the Debtor and will be made available to interested parties upon request.

(v)     Subject only to Prior Liens (as defined below) the Lender Pre-Petition Claim evidenced by the Pre-Petition Claim Documents is secured by perfected first priority liens and security interests in, *inter alia*, a first in priority real property mortgage upon real property of the Debtor located in Langley and Vinita, Oklahoma (the "<u>Lender Real Property Collateral</u>"), and the proceeds and products thereof (collectively, the "<u>Lender Pre-Petition Collateral</u>"), including, without limitation, the following presently-owned and after-acquired personal property related to the Lender Real Property Collateral:  (a) accounts, (b) accessions, (c) chattel paper (both tangible and electronic), (d) commercial tort claims, (e) deposit accounts, (f) documents, (g) fixtures, (h) intellectual property, (i) instruments, (j) permits, (k) collateral records, and (l) insurance, (as each such term may be defined in the Oklahoma Uniform Commercial Code as of the date hereof).  Lender's liens and security interests in the Lender Pre-Petition Collateral were granted pursuant to, *inter alia*, the Pre-Petition Claim Documents.

(vi)    Lender has properly perfected its first priority liens and security interests and other liens in the Lender Pre-Petition Collateral (subject to Prior Liens (if any)) as evidenced by, among other things, the Pre-Petition Claim Documents, documents held in possession of Lender and documents filed with the appropriate state, county, and other offices.

(vii)   The Debtor is not in default of its debts and obligations to Lender under the terms and provisions of the Pre-Petition Claim Documents.  The Lender has waived any default arising from the filing of this Case.

### <u>NECESSITY OF LOAN FACILITY</u>

10.     Good, adequate, and sufficient cause has been shown to justify the granting of the relief requested in the Motion.  The ability of the Debtor to maximize the value of its assets and obtain confirmation of a plan of debt adjustment depends upon the Debtor's ability to use the Loan Facility.

11.     Without the use of the Loan Facility, the Debtor may not have the funds necessary to conduct its business in the ordinary course of business, maintain its assets, provide financial information, or pay employee compensation, payroll taxes, overhead, and other expenses necessary to maximize the value of the Debtor's assets by obtaining confirmation of a plan, and thereby continue providing quality healthcare to the community it serves.  The Debtor is seeking

authority to obtain the Loan Facility due to the risk of cash flow interruptions and fluctuations frequently attendant to any debt adjustment case under the Bankruptcy Code.  Lender is willing to provide the Loan Facility to or for the benefit of the Debtor only in accordance with the terms of the Loan Agreement and this Financing Order.  Accordingly, entry into the Loan Facility is necessary to adjusting the Debtor's debts, and the relief hereunder is necessary to allow the Debtor to continue to provide health care services to residents of Craig County and the surrounding area.

12.     The Debtor has requested that Lender provide the Loan Facility in order to provide funds to be used for the purposes set forth therein, and such other purposes as permitted by this Financing Order and to which Lender consents in writing.

13.     The Debtor has sought to obtain financing from other sources and is unable to obtain credit allowable under Bankruptcy Code § 503(b)(1), or pursuant to Bankruptcy Code §§ 364(a) and (b), on terms more favorable to the Debtor than the terms of the Loan Facility.

14.     The terms of the Loan Facility and this Financing Order, including, without limitation, the related fees granted in accordance therewith, are fair, just, and reasonable under the circumstances, are ordinary and appropriate for secured financing to debtors in similar cases, reflect the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  Any credit extended under the terms of this Financing Order and the Loan Facility shall be deemed to have been extended in good faith by the Lender, as the term "good faith" is used in Bankruptcy Code § 364(e).

**LOAN FACILITY**

**Authorization to Obtain Credit**

15.     The Debtor is hereby authorized to obtain credit only in accordance with the Loan Agreement, the Loan Facility, and this Financing Order.

16.     The Debtor is hereby authorized to obtain post-petition loans and other extensions of credit in an amount not to exceed $600,000.00 on a final basis pursuant to the terms of this Financing Order and the terms of the Loan Agreement.

17.     The Loan Facility Documents and the terms therein, including, without limitation, the fees, indemnification provisions, are approved in their entirety.  The Debtor is authorized to execute, deliver and perform under the Loan Facility Documents.

**Superpriority Liens and Administrative Claims**

18.     Effective as of the entry of this Order, Lender is entitled to and is hereby granted first priority claims, liens and security interests, and the protections of good faith credit providers under Bankruptcy Code §§ 364(c)(1), (c)(2), and (c)(3), and 364(e) to secure the Loan Facility, senior to all other liens and security interests, to secure repayment of principal and any other extensions of credit, interest, fees, expenses, and any fees and expenses of Lender in this Case, however incurred, but subject only to Prior Liens (if any) and the Carve-Out (as defined below).

19.     The first priority liens and security interests securing the Loan Facility granted hereby are effective as of the entry of this Order and are valid and automatically perfected first priority liens and security interests, subject only to Prior Liens and the Carve-Out, in and upon, and hereby are granted in and attach to, any and all assets and properties of the Debtor, now owned or after acquired, real and personal, and the proceeds and products thereof (collectively, the "Collateral," including, without limitation, (1) the following presently-owned and after-

acquired personal property:  (a) accounts, (b) accessions, (c) chattel paper (both tangible and electronic), (d) commercial tort claims, (e) commodity accounts, (f) commodity contracts, (g) deposit accounts, (h) documents, (i) equipment, (j) financial assets, (k) fixtures, (l) general intangibles, (m) goods, (n) intellectual property, (o) instruments, (p) inventory, (q) investment property, (r) letters of credit, (s) letters of credit rights, (t) payment intangibles, (u) permits, (v) farm products, (w) crops, (x) timber, (y) as-extracted collateral, (z) mobile homes, (aa) health care insurance receivables, (ab) securities (certificated and uncertificated), (ac) securities accounts, (ad) securities entitlements, (ae) software, (af) supporting obligations, (ag) collateral records, (ah) insurance, (ai) causes of action, and (aj) money (as each such term may be defined in the Oklahoma Uniform Commercial Code as of the date hereof) and (2) all presently owned or after acquired real property and improvements thereon and leases of real property; provided, however, the Collateral shall not include any causes of action under Bankruptcy Code § 544, 547, and 548 or the proceeds therefrom (the "Avoidance Claims").

20.    Additionally, on account of the Loan Facility, Lender is hereby granted superpriority administrative claims and all other benefits and protections allowable under Bankruptcy Code §§ 507(b) and 503(b)(1), senior in right to all other administrative claims against the Debtor, except for the Carve-Out.

21.    The Debtor may instruct Lender, in writing, or in another manner acceptable to Lender, to stop payment on certain prepetition items that may be presented to Lender for payment.  In the event an item is presented, and regardless of whether the Debtor has given a stop payment order, and such item is cleared, Lender will have no liability regarding same and the Debtor's sole remedy shall be recovery from the transferee.

22.     Lender may rely on the representations of the Debtor with respect to whether any check, item, or other payment order drawn or issued by the Debtor prior to the Petition Date should be honored pursuant to this or any other order of this Court, and Lender shall not have any liability to any party for relying on such representations by the Debtor as provided for herein.

**<u>Automatic Perfection</u>**

23.     This Financing Order shall be sufficient and conclusive evidence of the priority, perfection, attachment, and validity of all of Lender's security interests in and liens on the Collateral granted and created hereunder, and such security interests and liens shall constitute valid, automatically perfected and unavoidable security interests and liens, with the priorities granted hereunder, effective as of the Petition Date, without the necessity of creating, filing, recording, or serving any financing statements, mortgages, or other documents that might otherwise be required under federal or state law in any jurisdiction or the taking of any other action to validate or perfect the security interests and liens granted to Lender by this Financing Order.

24.     To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of Lender's liens and security interests granted and created by this Financing Order or otherwise would impose filing or registration requirements with respect to such liens and security interests, such law is hereby pre-empted to the maximum extent permitted by the Bankruptcy Code, applicable federal law, and the judicial power of the United States Bankruptcy Court.

25.     By virtue of the terms of this Financing Order, to the extent that Lender has filed Uniform Commercial Code financing statements, mortgages, deeds of trust, or other security or perfection documents under the name of the Debtor, such filings shall be deemed to properly perfect its liens and security interests granted under this Financing Order without further action by Lender.

26.     If Lender shall, in its sole and absolute discretion, elect for any reason to file any Uniform Commercial Code financing statements, mortgages, deeds of trust, or other recordable documents to further evidence perfection of its interests in property of the Debtor, Lender, or, upon the request of Lender, the Debtor, is authorized and directed to execute or file, or cause to be executed or filed, all such financing statements or other documents, and the filing, recording, or service (as the case may be) of such financing statements or similar documents shall be deemed to have been made at the time of and on the Petition Date, and the signature(s) of any person(s) designated by the Debtor, whether by letter to Lender or by appearing on any one or more of the agreements or other documents respecting the security interests and liens of Lender granted hereunder, shall bind the Debtor.  Lender may, in its sole and absolute discretion, file a certified copy of this Financing Order in any filing or recording office in any county or other jurisdiction in which the Debtor has real or personal property, and, in such event, the subject filing or recording officer is authorized and directed to file or record such documents or a certified copy of this Financing Order.

## Authorization to Act

27.     The Debtor is hereby authorized and directed to perform all acts, take any action, and execute and comply with the terms of such other documents, instruments and agreements, as Lender may reasonably require as evidence of and for the protection of the Collateral, or that

may be otherwise deemed necessary by Lender to effectuate the terms and conditions of this Financing Order and the Loan Facility.

28.     Until all of the Loan Obligations shall have been indefeasibly paid and satisfied in full in accordance with Loan Facility Documents, and without further order of the Court: (a) the Debtor shall use the Loan Facility proceeds strictly in accordance with the terms of the Loan Facility Documents and the other terms of this Financing Order; (b) the Debtor shall not, without prior order from the Court (after notice to Lender), engage in any transaction that is not in the ordinary course of the Debtor's business, and (c) the Debtor shall timely comply with all of the covenants set forth in the Loan Facility Documents.

## Prior Liens

29.     The security interests and liens of Lender granted pursuant to the terms of this Financing Order are subject to any other valid, perfected and unavoidable liens and security interests of any other secured creditor in any assets of any of the Debtor existing on the Petition Date that are senior in priority under applicable law to Lender's liens and security interests granted under the Pre-Petition Claim Documents in the Pre-Petition Collateral (collectively, the "Prior Liens").  VFI-SPV VIII Corp. a/k/a/ Varilease Finance, Inc., Amerisourcebergen Drug Corporation and The Bank of American Fork, Utah as assignee of TFG Leasing Fund III, LLC (collectively the "Equipment Lessors") have given notice of a purported security interest by the filing of several UCC-1 financing statements (the "Notice Liens") in all equipment, all accounts receivable and all general intangibles (the "General Assets") that are beyond the specific equipment, goods and related property that is the subject of the Equipment Leases (the "Specific Assets"), however the contracts between the Debtor and the Equipment Lessors do not grant any liens upon the General Assets and therefore, except for the purchase money security interests in

the Specific Assets created by the Equipment Leases, the Equipment Lessors do not hold any Prior Liens on any of the General Assets. To avoid any ambiguity, the liens granted to the Lender shall be subordinate to the Prior Liens created by the Equipment Leases on the Specific Assets.  The Debtor or any other party in interest, including Lender, shall have the right to object to the validity, priority, or extent of any such Prior Liens, or the allowance of such debts secured thereby, or to institute any actions or adversary proceedings with respect thereto.  The post-petition liens granted to Lender pursuant to this Financing Order shall not at any time be (a) made subject or subordinated to, or made *pari passu* with, any other lien or security interest existing on the Petition Date, or any claim, lien, or security interest created under Bankruptcy Code §§ 363 or 364(d) or otherwise (except with respect to any Prior Liens), or (b) subject to any lien or security interest that is avoided and preserved for the benefit of the Debtor under Bankruptcy Code § 551.

## No Additional Liens

30.    Until such time as the Loan Obligations shall have been indefeasibly paid and satisfied in full in accordance with the Loan Facility Documents, the Debtor shall not be authorized to obtain credit secured by a lien or security interest in the Pre-Petition Collateral or the Collateral, other than the Loan Facility, without the prior written consent of Lender or order of the Court upon reasonable notice.

## No Liability

31.    From and after the entry of this Order, no act committed or action taken by Lender under this Financing Order, including, without limitation, the collection of the Pre-Petition Claims, or the Loan Facility, shall be used, construed, or deemed to hold Lender to be in "control" of or participating in the governance, management, or operations of the Debtor for any

purpose, without limitation, or to be acting as a "responsible person(s)" or "owner(s) or operator(s)" or a person(s) in "control" with respect to the governance, management, or operation of the Debtor or its business (as such terms, or any similar terms, are used in the Internal Revenue Code, WARN Act, Comprehensive Environmental Response, Compensation and Liability Act, or the Bankruptcy Code, each as may be amended from time to time, or any other federal or state statute, at law, in equity, or otherwise) by virtue of the interests, rights, and remedies granted to or conferred upon Lender under the Pre-Petition Claim Documents, the Loan Facility Documents, or this Financing Order including, without limitation, such rights and remedies as may be exercisable by Lender in connection with this Financing Order.

## **Automatic Stay**

32.     The Automatic Stay is hereby vacated and modified to the extent necessary to permit (a) the Debtor and the Lender to commit all acts and take all actions necessary to implement the Loan Facility and this Financing Order, (b) all acts, actions and transfers contemplated herein, including, without limitation, transfers of funds to Lender by the Debtor as provided herein, and (c) consistent with the terms of this Financing Order, Lender at its option to pursue its rights and remedies as to the Collateral in accordance with the Loan Facility Documents and applicable law.

## **Collateral Insurance**

33.     The Debtor shall maintain, with financially sound and reputable insurance companies, insurance of the kind covering the Collateral, and in accordance with the Loan Facility Documents (covering such risks in amounts as shall be satisfactory to Lender and shall name Lender as loss payee thereunder).

34.     To the extent the Debtor has made or makes any deposits for the benefit of utility companies or any other entity such deposits shall be, and hereby are, upon any return of same to the Debtor, subject to the first priority perfected liens and security interests of Lender in respect of the Loan Facility granted by this Financing Order.

## Reporting Requirements

35.     The Debtor is authorized and directed to provide to Lender all of the documentation and reports required under the Loan Agreement and the other Loan Facility Documents, unless Lender waives or modifies such requirements in writing.

36.     Lender and its representatives, agents, consultants, and other professionals shall be permitted, in coordination with Debtor's counsel, to contact and communicate with the Debtor and its financial advisors regarding the operation of the Debtor's business or the plan of adjustment in this Case.  The Debtor shall be responsive and employ its best efforts to cooperate in the coordination of all such contacts and communications, including, without limitation, by conducting update telephone conferences involving the Debtor, its financial advisors (if any) and Lender, upon request.

37.     Subject to federal, state and local laws and regulations governing the operation of health care facilities and the maintaining of health care records, Lender and its agents and advisors shall have full access, upon reasonable notice during normal business hours, to the Debtor's business records, business premises, and to the Collateral to enable Lender or its agents and advisors to (a) review, appraise, and evaluate the physical condition of the Collateral, (b) inspect and review the financial records and all other records of the Debtor concerning the operation of the Debtor's business, and (c) evaluate the Debtor's overall financial condition and

all other records relating to the operations of the Debtor.  The Debtor shall fully cooperate with Lender regarding such reviews, evaluations, and inspections, and shall make its employees and professionals available to Lender and its agents and advisors to conduct such reviews, evaluations, and inspections.

### Professional Fees of the Estates

38.      Lender consents, subject to the terms and conditions set forth in this Financing Order, to a carve out from their Collateral (a) for the payment of the reasonable professional fees and expenses of Case Professionals[4] in an amount not to exceed such amounts that are found to be reasonable by this Court pursuant to §943(b)(3), plus (b) an aggregate amount not to exceed $30,000.00 to be used to pay fees earned and expenses incurred subsequent to the occurrence of an Event of Default (collectively, the "Carve-Out").  Payments from the Carve-Out shall be subject to any terms and conditions of any engagement agreements executed by the Debtor.

39.      So long as no Event of Default shall have occurred and be continuing, the Debtor shall be permitted to pay reasonable compensation and reimbursement of expenses subject to a final determination by the Court pursuant to §943(b)(3) that all such amounts are reasonable. Other than the Carve-Out set forth above, Lender does not consent to any carve out from its Collateral for payment of any fees and expenses of the Case Professionals.

40.      Any and all payments of fees and expenses to any Case Professionals or use of Cash Collateral shall constitute diminution in the value of the Collateral for all purposes including all adequate protection and superpriority claims granted under the Bankruptcy Code and this Financing Order.

---

[4] "Case Professionals" means any professional hired by the Debtor, the Committee or otherwise who seek to be paid by the Debtor for services rendered in relation to this case.

41.     Notwithstanding the foregoing, and irrespective of the Carve-Out, in no event shall the proceeds of any loans, advances, or other funds made available by the Lender to or for the benefit of the Debtor be used for the payment or reimbursement of any fees, expenses, costs, or disbursements of any Case Professional or other persons incurred with the purpose of: (a) objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, perfection, priority, or enforceability of the Pre-Petition Claims, the Pre-Petition Claim Documents, the Loan Facility, the Loan Facility Documents, this Financing Order, or any liens or security interests granted thereby or with respect thereto, or any other rights or interests of the Lender under any Pre-Petition Claim Document or Loan Facility Document, (b) investigating, asserting, prosecuting or the joinder in any claims or causes of action against the Lender or any of its officers, directors, employees, affiliates, agents, attorneys, or equity holders (whether arising under state law, the Bankruptcy Code or any other federal or foreign law); (c) preventing, enjoining, hindering or otherwise delaying the Lender's enforcement of the Pre-Petition Claim Documents, the Loan Facility Documents or this Financing Order or any realization upon any Collateral (unless such enforcement or realization is in direct violation of an explicit provision in any Loan Facility Document or this Financing Order); (d) incurring indebtedness except as permitted by the Loan Facility Documents or this Financing Order; (e) modifying the Lender's rights under any Loan Facility Documents or this Financing Order without Lender's consent; (f) asserting or declaring any liens or security interests granted under any of the Pre-Petition Claim Documents, the Loan Facility Documents, or this Financing Order to have a priority other than the priority set forth herein or therein; (g) asserting, prosecuting or the joinder in, any action or other proceeding seeking to grant a lien or security interest senior to, or on parity with, the liens and security interests of Lender in the Collateral or any portion thereof without the Lender's

consent; (h) asserting or declaring any of the Pre-Petition Claim Documents, Loan Facility Documents, or this Financing Order to be invalid, not binding or unenforceable in any respect; or (i) selling any Collateral except as specifically permitted in the Loan Facility Documents or this Financing Order.  Notwithstanding the foregoing, Loan Facility advances may be used to pay the fees earned and expenses incurred by counsel to the Committee in an amount not to exceed $10,000.00 for reviewing the Pre-Petition Claims, the Pre-Petition Claim Documents, and any liens or security interest granted thereby.

## <u>No Surcharge</u>

42.     No costs or expenses of administration which have or may at any time be incurred in this Case shall be charged against Lender, its claims or the Collateral pursuant to Bankruptcy Code § 506(c) without the prior written consent of Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by Lender.  Lender shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

## <u>EVENTS OF DEFAULT/REMEDIES</u>

43.     The occurrence of any of the following shall constitute an Event of Default under this Financing Order upon notice to the Debtor by Lender: (a) any default, violation, or breach by the Debtor of any of the terms of this Financing Order; (b) the occurrence of the Expiration Date (as defined below), maturity, termination, expiration, or non-renewal of this Financing Order or the Loan Facility as provided for herein or in any of the Loan Facility Documents; (c) any challenge to the extent, validity, priority, or unavoidability of Lender's liens securing the Pre-Petition Claims and/or the Loan Facility is commenced by the Debtor or an order is entered sustaining any such challenge commenced by any party other than the Debtor; (d) the occurrence

of any default or event of default under the Loan Agreement or any other Loan Facility Document; or (e) the failure of the Debtor to make any payments to Lender that are required to be paid under this Financing Order (any of the foregoing events of default being referred to in this Financing Order, individually, as an "Event of Default", or severally, as "Events of Default").

44.     Immediately upon the occurrence of any Event of Default, and at all times thereafter, and without further act or action by Lender, or any further notice, hearing, or order of this Court: (a) Lender may terminate any and all obligations of Lender in connection with the Loan Facility or under this Financing Order and the Loan Facility Documents, and (b) Lender may declare all or any part of the Loan Facility to be immediately accelerated and due and payable for all purposes, rights, and remedies.

45.     Furthermore, upon the occurrence of any Event of Default, and after the giving of five (5) business days' notice by Lender to the Debtor and the Committee, then without further act or action by Lender, or any further notice, hearing or order of this Court, the Automatic Stay shall be immediately modified and Lender shall be and is hereby authorized, in its sole and absolute discretion, to take any and all actions and remedies that Lender may deem appropriate to proceed against, take possession of, protect, and realize upon the Collateral and any other property of the Debtor, including, without limitation, (i) any right or remedy set forth in the Loan Facility Documents, without limitation, or this Financing Order, (ii) any right or remedy that the Lender may deem appropriate to proceed against, take possession of, foreclose upon, sell (in whole or in part), protect, and realize upon the Collateral and any other property of the Debtor upon which the Lender has been or may hereafter be granted liens and security interests to obtain repayment of the Loan Facility, (iii) the commencement of actions for specific performance and

for the foreclosure upon any Collateral, (iv) the sale of the Collateral, or any portion thereof, either as a whole or in part, at private or public auction, and the Lender shall have the right to purchase the Collateral at same by credit bidding all or a part of its debt or otherwise, (v) taking possession of the Collateral, and the exercise, without interference, and, if necessary, as the attorney-in-fact for the Debtor, of any rights of the Debtor in the management, possession, operation, protection or preservation of the Collateral, (vi) the receipt of proceeds from the sale of any Collateral, (vii) the direction of the payment for any purchase of the Collateral directly to the Lender, as applicable, (viii) the right of setoff and recoupment as to any funds of the Debtor held by Lender, (ix) if appropriate, the right to seek and obtain the appointment of a receiver over the Debtor and/or the Collateral, and (x) the right to reproduce, copy, download, or otherwise take possession of any records or data, tangible or electronic, constituting Collateral; provided that the Lender shall not be obligated to take title to any of the Collateral in the pursuit of any of the Lender's rights and remedies and the Debtor shall cooperate with the Lender in conjunction with the exercise of any right and the pursuit of any remedy by Lender, without limitation.

46.     Upon or after the occurrence of any Event of Default, Lender may, in its sole and absolute discretion, advance funds to the Debtor, and all such advances (i) shall not constitute a waiver, limitation, or modification of Lender's rights and remedies pursuant to the Loan Facility Documents, this Financing Order, and applicable law and (ii) shall be and hereby are granted all of the protections granted to Lender under this Financing Order in connection with the Loan Facility.

## OTHER TERMS

47.     The Debtor and the Lender are authorized to implement, in accordance with the terms of the Loan Facility Documents, any modifications or amendments to any Loan Facility Document which are not material and adverse to the Debtor.  Any modifications or amendments of any Loan Facility Document which are material and adverse to the Debtor shall be subject to prior approval by this Court upon motion by the Debtor.

48.     Other than any Prior Liens and the Carve-Out, no priority claims shall be allowed that are or will be prior to or on parity with the superpriority claims or secured claims of Lender arising from the Pre-Petition Claim Documents, the Loan Facility Documents, the Interim Financing Order, and this Financing Order.

49.     No obligations incurred or payments or other transfers made by or on behalf of the Debtor on account of the Loan Facility shall be avoidable or recoverable from Lender under any section of the Bankruptcy Code, or any other federal, state, or other applicable law.

50.     The Debtor shall not sell, transfer, lease, encumber, or otherwise dispose of any of the Collateral, without the prior written consent of Lender.

51.     The terms hereunder and under the Loan Facility Documents, the security interests and liens granted to Lender under this Financing Order, and the rights of Lender pursuant to this Financing Order with respect to the Collateral, shall not be altered, modified, extended, impaired, or affected by any plan of debt adjustment of the Debtor without the prior written approval of Lender.

52.     The terms and provisions of this Financing Order and any actions taken pursuant hereto shall survive entry of any order that may be entered dismissing this Case.  The terms and provisions of this Financing Order, as well as the priorities in payment, liens, and security interests granted pursuant to this Financing Order, and the Loan Facility Documents, shall continue in this or any superseding case under the Bankruptcy Code of the Debtor, and such priorities in payment, liens and security interests shall maintain their priority as provided by this Financing Order until such time as the Loan Obligations shall have been indefeasibly paid and satisfied in full in accordance with the Loan Facility Documents and Lender shall have no further obligation or financial accommodation to the Debtor.

53.     The provisions of this Financing Order shall inure to the benefit of the Debtor and the Lender and they shall be binding upon (a) the Debtor and its successors and assigns, including any trustee or other fiduciary hereafter appointed as legal representative of the Debtor or with respect to property of the Debtor, whether under chapter 9 of the Bankruptcy Code or any confirmed plan and (b) all creditors of the Debtor and other parties in interest.

54.     If any or all of the provisions of this Financing Order are hereafter modified, vacated or stayed without the prior written agreement of Lender, such modification, vacation or stay shall not affect (a) the validity of any obligation, indebtedness or liability incurred by the Debtor to Lender before the effective date of such modification, vacation or stay or (b) the validity or enforceability of any security interest, lien, priority, or other protection authorized, granted or created hereby or pursuant to this Financing Order or any of the Loan Facility Documents.  Notwithstanding any such modification, vacation or stay, any indebtedness, obligations or liabilities incurred by the Debtor to Lender before the effective date of such modification, vacation or stay shall be governed in all respects by the original provisions of this

Financing Order, and Lender shall be entitled to all the liens, rights, remedies, privileges, and benefits granted herein and pursuant to the Loan Facility Documents with respect to all such indebtedness, obligations or liabilities.

55.     To the extent the terms and conditions of the Loan Facility Documents are in express conflict (as opposed to being additive, limiting or more specific than this Financing Order) with the terms and conditions of this Financing Order, the terms and conditions of this Financing Order shall control.

56.     No approval, agreement or consent requested of Lender by the Debtor pursuant to the terms of this Financing Order or otherwise shall be inferred from any action, inaction or acquiescence of Lender other than in writing acceptable to Lender that is signed by Lender and expressly shows such approval, agreement or consent, without limitation.

57.     Unless expressly and specifically provided otherwise herein, nothing herein shall be deemed or construed to waive, limit, modify, or prejudice the claims, rights, protections, privileges, and defenses of Lender afforded pursuant to the Bankruptcy Code.

58.     This Financing Order, and the findings of fact and conclusions of law contained herein, shall be effective upon signature by the Court, and may be relied upon by Lender and the Debtor without the necessity of entry into the docket sheet of this Case.  To the extent any findings may constitute conclusions, and vice versa, they are hereby deemed as such.

59.     This Court hereby expressly retains jurisdiction over all persons and entities, co-extensive with the powers granted to the United States Bankruptcy Court under the Bankruptcy

Code, to enforce the terms of this Financing Order and to adjudicate any and all disputes in connection therewith by motion and without necessity of an adversary proceeding.

60. All headings in this Financing Order are descriptive and for reference only, and do not have separate meaning or change any terms therein.

## RESERVATION OF RIGHTS OF PARTIES IN INTEREST/DEADLINE TO ACT

61. Parties-in-interest (other than the Debtor) that have or have been granted standing shall have 60 days from the date of entry of this Financing Order (or, in the case of the Committee, if appointed, 60 days from the date of appointment of the Committee) to file a complaint pursuant to Bankruptcy Rule 7001 asserting a claim or cause of action arising out of the Pre-Petition Claim Documents, or otherwise challenging the extent, priority, validity, perfection, amount, or allowability of Lender's claims or security interests, arising out of or related to the Pre-Petition Claim Documents or the transactions related thereto. Such complaint, if filed, shall be diligently pursued by such party in interest or the Committee, as applicable.

62. Otherwise, if no action is commenced or pursued in accordance with the deadlines in the immediately preceding paragraph or such deadlines are not extended in writing by the Lender in its sole and absolute discretion, all of the Debtor's stipulations and affirmations of the allowance, priority, extent, and validity of Lender's claims, liens and interests, of any nature set forth in this Financing Order and the Debtor's waivers and releases as contained in or otherwise incorporated or set forth in this Financing Order shall be of full force and effect and forever binding upon the Debtor and all creditors and parties-in-interest of this Case, including, without limitation, upon any creditors or parties-in-interest that did not have or were not granted standing prior to such deadlines. Notwithstanding the foregoing and regardless of the timely

commencement of an action as contemplated in paragraph 61, the Debtor's stipulations and affirmations of the allowance, priority, extent, and validity of Lender's claims, liens and interests, of any nature set forth in this Financing Order and the Debtor's waivers and releases as contained in the Loan Facility Documents or otherwise incorporated or set forth in this Financing Order  shall be in full force and effect with respect to any claims or causes of action not timely raised within the deadlines set forth in paragraph 61 above.

## NOTICE; EXPIRATION DATE/MATURITY

63.    The Debtor's counsel shall serve this Financing Order on all of the following parties: (a) the Office of the United States Trustee; (b) the attorneys for Lender; (c) all creditors known to the Debtor who have or may assert liens against any of the Debtor's assets; (d) the United States Internal Revenue Service; (e) the 20 largest unsecured creditors of the Debtor; and (f) all parties in interest who have filed a notice of appearance or upon whom service must be effected under the Federal Rules of Bankruptcy Procedure or the Local Rules.

64.    Lender's commitment to provide credit under the Loan Agreement and this Financing Order shall be effective upon entry of this Financing Order to and including the earlier of: (a) notice of the occurrence of an Event of Default or (b) February 28, 2020, at which time all of the Debtor's authority to obtain credit under the Loan Agreement and this Financing Order shall terminate, as shall Lender's obligation to continue funding the Loan Facility, unless extended by written agreement of the parties hereto, a copy of which is filed with this Court by the Debtor (the "Expiration Date").

**THIS ORDER IS EFFECTIVE IMMEDIATELY**.

**###**

**SUBMITTED BY:**


/s/ *Mark A. Craige*
Mark A. Craige, OBA #1992
Michael R. Pacewicz, #18794
Crowe & Dunlevy, a Professional Corporation
500 Kennedy Building
321 South Boston Avenue
Tulsa, Oklahoma 74103-3313
Tel.: 918.592.9800
Fax:  918.592.9801
e-mail: mark@law-office.com
michael.pacewicz@crowedunlevy.com

**COUNSEL FOR DEBTORS**

2677429.4

# LOAN AGREEMENT

Dated as of
February __, 2015

between

## CRAIG COUNTY HOSPITAL AUTHORITY
### an Oklahoma probate trust

"BORROWER"

and

## THE FIRST NATIONAL BANK & TRUST COMPANY,
### Vinita, Oklahoma

"BANK"

## LOAN AGREEMENT

THIS LOAN AGREEMENT, dated effective as of February __, 2015, is made and entered into between CRAIG COUNTY HOSPITAL AUTHORITY, an Oklahoma public trust, a/an  (the "Borrower"), and THE FIRST NATIONAL BANK & TRUST COMPANY, Vinita, Oklahoma (the "Bank").

RECITALS:

A.     The Borrower has requested the Bank to extend a revolving credit facility to Borrower in the maximum principal amount of $600,000.00 (the "Commitment") to be evidenced by Borrower's $600,000.00 Promissory Note payable to the order of the Bank dated as of even date herewith (the "Note").

B.     The Bank is willing to issue the Commitment to the Borrower, all upon the terms and conditions herein set forth, in order to provide Borrower working capital to be used in connections with Borrower's business.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, receipt of which is acknowledged by the parties hereto, the parties agree, as follows:

Article I

## CERTAIN DEFINITIONS

When used herein, the following terms shall have the following meanings:

"Affiliate" means any Person who has a relationship with the Borrower whereby such Person or the Borrower directly or indirectly controls, is controlled by or is under common control with the other, or holds or beneficially owns 10% or more of the equity interest in the other or 10% or more of any class of voting securities of the other.  For purposes of this definition, a Person has "control" over another Person if such Person has the ability to exercise a controlling influence over the management and policies of the other Person.

"Applicable Prime Rate" shall mean the per annum "prime rate," as published from time to time in the Money Rates column of The Wall Street Journal (Southwest Edition), changing annually as of each February 28. commencing February 28, 2016.  In the event such rate is no longer published as provided herein, the Bank shall designate a comparable or similar index rate as the "Applicable Prime Rate" and notify the Borrower of such designation.

"Bankruptcy Code" shall mean the United States Bankruptcy Code (Title 11 of the

"Business Day" shall mean a day other than a Saturday, Sunday or a day upon which banks in the State of Oklahoma are closed to business generally.

"Closing Date" shall mean the date of this Agreement.

"Collateral" shall have the meaning ascribed to it in Section 3.1 of this Agreement.

"Commitment" shall mean the Revolver Commitment.

"Contingent Debt" shall mean, with respect to any Person, without duplication, any contingent liabilities, obligations or indebtedness of such Person (other than endorsements in the ordinary course of business of negotiable instruments for deposit or collection), including (i) any obligations or similar undertakings to guarantee any indebtedness of any other Person in any manner, whether direct or indirect, and including any obligation to purchase any such indebtedness or any property constituting security therefor, to advance or provide funds or other support for the payment or purchase of any such indebtedness or to maintain working capital, solvency or other balance sheet condition of such other Person (including keep well agreements, maintenance agreements, comfort letters or similar agreements or arrangements) for the benefit of any holder of indebtedness of such other Person, to lease or purchase property, securities or services primarily for the purpose of assuring the holder of such indebtedness, or otherwise to assure or hold harmless the holder of such indebtedness against loss in respect thereof, (ii) obligations to indemnify other Persons against liability or loss, to the extent not arising in the ordinary course of business, and (iii) warranty obligations and other contractually assumed obligations, to the extent not arising in the ordinary course of business.

"Debt" shall mean and include, as of any date, all items which, in accordance with GAAP, would be included on the liabilities side of Borrower's balance sheet, including all obligations under leases which, in accordance with GAAP, would be recorded as capital leases, but excluding stated capital, paid-in capital and retained earnings.

"Default Rate" shall mean the then applicable per annum contract rate of interest, plus four percentage points (4.0%) per annum.

"Dollar," "Dollars" and the symbol "$" shall mean lawful currency of the United States of America.

"Eligible Accounts" shall mean an Account (as defined in Article 9 of the applicable Uniform Commercial Code) that meets the following standards until the same is collected in full:

      (a)     The Account is owned by and payable to the Borrower and represents a sum of money (exclusive of interest, late charges or carrying charges) unconditionally due and owing not more than one hundred twenty (120) days from the original invoice date from an account debtor ("Account Debtor") thereof for services rendered or goods sold by Borrower to such Account Debtor in the ordinary course of business and which services or goods have been accepted by the Account Debtor, whether invoiced or not, and such sum of money does not remain unpaid for a period in excess of one hundred twenty (120) days from the original invoice date;

      (b)     The Account is not a contra account and is not otherwise subject to any dispute, set-off, recoupment, counterclaim or other claim which would reduce the amount to be paid by the Account Debtor to Borrower, and the Account Debtor has not received or requested permission to pay the same in installments at dates later than were originally

due and payable; it being further understood that contract retainages will not constitute Eligible Accounts;

(c)     The Borrower has in its possession and under its control or has furnished to the Bank invoices and other written business records and memoranda sufficient to document and verify the Borrower's Accounts and the amount thereof and to enforce collection thereof;

(d)     The Account is not evidenced by any promissory note, trade acceptance, negotiable instrument or judgment and does not constitute Chattel Paper (as defined in Article 9 of the applicable Uniform Commercial Code);

(e)     The Account Debtor is neither a parent, subsidiary nor a corporate affiliate of the Borrower, nor a corporation, partnership or other entity controlled directly or indirectly by the Borrower;

(f)     The Account Debtor is not a director, officer, manager or an employee of the Borrower, nor a member of the family of any director, officer, manager or employee of the Borrower, nor any proprietorship or partnership owned in whole or in part by any such director, officer, manager or employee of the Borrower, or by any member of the family of any such person;

(g)     The Account is not subject to the federal statutes requiring notice of the assignment of claims against the United States of America, unless (i) Borrower shall have given the Bank advance notice of the officer, office and filing address for notice, and telephone number for such office, (ii) Borrower shall have executed all documents which shall have been requested by the Bank in connection with the notice of assignment of such claims, (iii) the Bank shall have filed such notice in the appropriate manner and shall have received confirmation thereof to its satisfaction, and (iv) the Bank shall have received an opinion of Borrower's counsel, acceptable to the Bank and its counsel, to the effect that all requisite action has been taken to properly perfect the Bank's security interest in such Account and to properly provide notice of such assignment of claims; and

(h)     The Bank has, subject only to professional fees in Borrower's Chapter 9 proceeding, a first priority security interest in the Account and its proceeds.

The above specifications with respect to the term "Eligible Accounts" are special specifications adopted and the designation of such specifications shall not be interpreted to limit in any respect any security interest granted to the Bank.

"ERISA" shall mean the Federal Employee Retirement Income Security Act of 1974, as amended, together with all regulations and rulings promulgated with respect thereto.

"Event of Default" shall mean any of the events specified in Section 7.1 of this Agreement, and "Default" shall mean any event, which together with any lapse of time or giving of any notice, or both, would constitute an Event of Default.

"Funding Date" shall have the meaning ascribed to it in Section 4.1 of this Agreement.

"GAAP" shall mean generally accepted accounting principles applied on a consistent basis in all material respects to those principles so applied in the preceding period.  Unless otherwise indicated herein, all accounting terms will be defined according to GAAP.

"Governmental Authority" shall mean any federal, state, local or foreign court or governmental agency, authority, instrumentality or regulatory body.

"Governmental Requirement" shall mean any applicable statute, law, code, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, authorization, ordinance, Environmental Laws, energy regulations and occupational, safety and health standards or controls of any Governmental Authority.

"hereby," "herein," "hereof," "hereunder" and similar such terms shall mean and refer to this Agreement as a whole and not merely to the specific section, paragraph or clause in which the respective word appears.

"Indebtedness" shall mean and include any and all: (i) indebtedness, obligations and liabilities of the Borrower to the Bank incurred or which may be incurred or purportedly incurred hereafter pursuant to the terms of this Agreement or any of the other Loan Documents, and any extensions, renewals, substitutions, amendments and increases in amount thereof, including such amounts as may be evidenced by the Note and all lawful interest, service fees, commitment fees and other charges, and all reasonable costs and expenses incurred in connection with the preparation, filing and recording of the Loan Documents, including attorneys fees; (ii) all reasonable costs and expenses, including attorneys' fees, paid or incurred by the Bank in enforcing or attempting to enforce collection of any Indebtedness and in enforcing or realizing upon or attempting to enforce or realize upon any collateral or security for any Indebtedness and in protecting and preserving the Bank's interest in the Indebtedness or any collateral or security for any Indebtedness in any bankruptcy or reorganization proceeding, including interest on all sums so expended by the Bank accruing from the date upon which such expenditures are made until paid, at an annual rate equal to the Default Rate; (iii) sums expended by the Bank in curing any Event of Default or Default of the Borrower under the terms of this Agreement, the other Loan Documents or any other security agreement or other writing evidencing or securing the payment of the Note together with interest on all sums so expended by the Bank accruing from the date upon which such expenditures are made until paid, at an annual rate equal to the Default Rate; (iv) any overdrafts, return items or ACH obligations of the Borrower to the Bank at any time; or (v) all "Indebtedness" or "Secured Indebtedness" as said terms are defined in each of the Loan Documents.

"Laws" shall mean all statutes, laws, ordinances, regulations, orders, writs, injunctions, or decrees of the United States, any state or commonwealth, any municipality, any foreign country, any territory or possession, or any Tribunal.

"Lien" shall mean any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any lease in the nature thereof, and the filing of or agreement to give any financing statement or other similar form of public notice under the Laws of any jurisdiction).

4

"Lien Notice" shall mean notice received or obtained by the Bank or knowledge obtained by the Bank of a Lien being claimed (whether valid or not) by any Person, other than the Bank or a trustee on behalf of the Bank, with respect to the Collateral.

"Loan Documents" shall mean this Agreement, the Note, the Security Instruments and all other documents, instruments, certificates and resolutions executed and delivered to the Bank by the Borrower pursuant to the terms of this Agreement.

"Loans" means all funds advanced by Bank to Borrower pursuant to the Commitment.

"Material Adverse Effect" shall mean a material adverse effect on or material impairment of (i) the validity or enforceability of any Loan Document or the rights, benefits or remedies of the Bank under any Loan Document, (ii) the condition (financial or otherwise), operations, business, assets, liabilities or prospects of the Borrower or any subsidiary, or (iii) the ability of the Borrower to perform or fulfill its obligations under the Loan Documents.

"Maturity Date" shall mean February __, 2020, unless otherwise extended in writing by the Bank subject to the termination provisions of Section 2.1.

"Note" shall mean the Revolver Note.

"Person" shall mean and include an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, and a government or any department, agency or political subdivision thereof.

"Requirement of Law" shall mean, as to any Person, any requirement or provision of the charter or organization documents of such Person, or of any law, statute, rule, regulation, code or ordinance, or of any order, decree, judgment, injunction or other determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or to which any of its material Properties is subject.

"Revolver Commitment" shall mean the agreement of Bank to make the Revolving Credit Loans pursuant to Section 2.1 of this Agreement in an amount not to exceed the Revolver Commitment Amount.

"Revolver Commitment Amount" shall be the maximum principal amount the Bank agrees to make available under the Revolver Commitment (such amount being stipulated to initially be $600,000 subject to Reduction pursuant to section 2.5).

"Revolver Note" shall mean the Promissory Note (Revolver Note) described in Section 2.2 of this Agreement, together with each and every extension, renewal, modification, rearrangement, replacement, substitution, consolidation and change in form thereof which may be from time to time and for any term or terms effected.

"Revolving Credit Loans" shall have the meaning ascribed to it in Section 2.1 of this Agreement.

"Security Agreement" shall have the meaning assigned to that term in Article III of this Agreement.

"Security Instruments" shall mean the Security Agreement and all other financing statements, lien entries, mortgages, assignments, security agreements, documents or writings of any and all amendments and supplements thereto, granting, conveying, assigning, transferring or in any manner providing the Bank with a security interest or mortgage lien in any property as security for the repayment of all or any part of the Indebtedness.

"Taxes" shall mean all taxes, assessments, fees, or other charges or levies from time to time or at any time imposed by any Laws or by any Tribunal.

"Tribunal" shall mean any municipal, state, commonwealth, federal, foreign, territorial or other sovereign, governmental entity, governmental department, court, commission, board, bureau, agency or instrumentality.

Article II

## COMMITMENT

2.1     Revolving Credit Loans.  The Bank agrees, upon the terms and subject to the conditions hereinafter set forth, to make loan advances for working capital and general corporate purposes of the Borrower ("Revolving Credit Loans") to the Borrower from the Closing Date until the Maturity Date, or until such later date as the Bank shall have extended its Revolving Credit Commitment in writing unless the Revolving Credit Commitment shall be sooner terminated pursuant to the provisions of this Agreement, in such amounts as may from time to time be requested by the Borrower so long as the aggregate unpaid principal amount of all Revolving Credit Loans advanced, outstanding and unpaid at any time under the Revolver Note as cash advances thereon do not exceed the Revolver Commitment Amount (stipulated to initially be $600,000.00).  **Notwithstanding the Maturity Date the Bank shall have the right, in its sole option, to elect to terminate  the Revolving Credit Commitment upon thirty (30) days written notice to Borrower prior to each annual review date (February 28), commencing February 28, 2016.**

2.2     Revolver Note.  On the Closing Date, the Borrower shall execute and deliver to the order of the Bank a Promissory Note (Revolver Note) in the maximum principal amount of $600,000.00, the form of which is annexed hereto as Exhibit A and hereby made a part hereof (as extended, renewed, modified, rearranged, replaced, substituted, consolidated and changed in form from time to time, collectively referred to as the "Revolver Note").   The Revolver Note shall be dated as of the Closing Date and shall be payable in consecutive monthly installments of interest only due on the last day of each calendar month, commencing March 31, 2015, with all outstanding principal and all accrued but unpaid interest due and payable at the Maturity Date.

2.3     Interest Rate; Late Fee.  All amounts outstanding on the Note shall accrue interest at a per annum rate equal to the Applicable Prime Rate plus three hundred basis points 3.0% payable in accordance with the terms, provisions and conditions of this Agreement (based on a calendar year of 360 days hereof but assessed for the actual number of days elapsed during each accrual period); provided however, that upon the occurrence of any Event of Default, the unpaid

6

principal amount and accrued interest on the Note shall bear interest computed at the Default Rate. If any payment on the Revolver Note is more than ten (10) days late, then Borrower shall pay a late fee equal to the lesser of (i) 3% of the unpaid portion of the payment or (ii) $150.00. Borrower and Bank agree that said late fee is not a penalty, but rather an estimation of the increased costs incurred by the Bank in processing such late payment.

2.4    <u>Revolving Credit Advances, Payments and Voluntary Prepayment</u>.    Each Revolving Credit Loan advance requested by the Borrower from the Bank shall (i) be requested in writing (including by email) by Borrower pursuant to a loan advance request, or alternatively, telephonically, no later than 1:00 p. m. (applicable current time in Vinita, Oklahoma) on the date upon which the advance is to be made (the "Request"); (ii) be in the amount of $5,000.00 or an integral multiple thereof (unless the amount then available to borrow is less than $5,000.00, in which event an advance may be made in the amount available); (iii) not cause the aggregate outstanding and unpaid principal amount of the Revolver Note to exceed the Revolver Commitment Amount; and (iv) be advanced by the Bank on the applicable date, provided the request is timely made in accordance with Section 2.4(i) hereof and all other conditions of funding are met. All advances made by the Bank pursuant to the Revolver Commitment shall, for mutual convenience, be deposited to the Borrower's operating account at the Bank (No. _____), and the Bank shall have no responsibility to monitor the distribution of such advances in any other respect.

The Borrower may from time to time make prepayments of principal without premium or penalty. The Borrower may reborrow funds under the Revolving Credit Commitment subject to the limitations and conditions for Revolving Credit Loans contained herein. In consideration of Bank permitting Borrower to make requests for Revolving Credit Loans by telephone and email, Borrower states that it is fully aware of the risks attendant thereto, and agrees to accept all such risks and to hold Bank harmless from any loss which Borrower may incur by reason of any such request, other than such as result from Bank's gross negligence or wanton disregard.

All advances made by the Bank on the Revolver Note and all payments or prepayments of principal and interest thereon made by the Borrower shall be recorded by the Bank in its records, and the aggregate unpaid principal amount so recorded shall be prima facie evidence of the principal amount owing and unpaid on the Revolver Note. The failure to so record shall not, however, limit or otherwise affect the obligations of the Borrower hereunder or under the Revolver Note to repay the principal amount of each Revolving Credit Loan together with all interest accrued thereon. All payments and prepayments shall be made in lawful money of the United States of America. Any payments or prepayments on the Revolver Note received by the Bank after 3:00 p.m. (applicable current time in Vinita, Oklahoma) shall be deemed to have been made on the next succeeding Business Day. All outstanding principal of and accrued interest on the Revolver Note not previously paid hereunder shall be due and payable on the Maturity Date, unless such Maturity Date shall be extended by the Bank in writing or accelerated pursuant to the terms hereof.

2.5    <u>Automatic Reduction of Revolving Credit Commitment</u>. Concurrent with the closing of the sale of the Safeway Building located in Vinita, Craig County, Oklahoma, and application of the net sale proceeds thereof against the Revolver Commitment balance

outstanding, the Revolver Commitment Amount shall be automatically and permanently reduced to $500,000.00.

Article III

<b>SECURITY</b>

3.1 <u>Collateral</u>.  Subject only to the payment of professional fees incurred in and pursuant to the Chapter 9 proceeding of Borrower as contemplated by Section 4.1(e) hereof, the repayment of the Indebtedness otherwise shall be secured by a first priority security interest pursuant to that certain Security Agreement and Assignment from Borrower dated as of even date herewith (the "Security Agreement") covering, inter alia, Borrower's present and future accounts, including contract rights, cash and cash equivalents, deposit accounts, inventory, equipment (including motor vehicles and other rolling stock), general intangibles, payment intangibles, letter of credit rights, supporting obligations, chattel paper, documents, instruments, proceeds, products and other rights of the items or types of collateral described in this Article III including without limitation, insurance proceeds and all cash, money, deposits, deposit accounts and/or demand accounts of Borrower at any time in the possession or control of the Bank (the collateral described herein and in the Security Instruments being collectively referred to as the "Collateral").

3.2 <u>Collection of Accounts</u>.Borrower at its own expense, will diligently attempt to collect upon all sums due the Borrower upon its accounts and contract rights.  Although the Bank does not contemplate immediate efforts on its part to effect direct collection of any such accounts, the Bank may elect, at its sole and absolute discretion, and automatically without further or other notice to the Borrower, to make or attempt to make direct collection of any one or more or all accounts or contract rights of the Borrower, and the Borrower will from time to time and as often as requested by the Bank, promptly execute and deliver to the Bank one or more specific written assignments of any one or more accounts or contract rights the Bank may select or designate, assigning the same to the Bank.  Such assignments shall be upon such form or forms the Bank may hereafter regularly employ for the purpose of evidencing the assignment to it, as collateral or security, of one or more specific accounts or contract rights.  In each instance in which the Bank may elect hereunder to effect direct collection of any one or more accounts or contract rights of the Borrower, the Bank shall also be entitled to take possession of all books and records of the Borrower relating to such account(s) or contract right(s) and the Borrower will not in any manner take or suffer any action to be taken to hinder, delay or interfere with the Bank's attempts to effect collection.

3.3 <u>Additional Documents or Instruments</u>.  The Borrower, at Borrower's expense, will promptly and diligently take or cause to be taken all action necessary to maintain and preserve any and all security interests and mortgage liens granted in the Collateral and will cause to be timely filed, together with the payment of all necessary filing fees and taxes, such UCC financing and continuation statements in such offices of public record, or will cause to be promptly delivered to the Bank such statements, instruments, assignments, documents or papers, as may be necessary, to keep the security interest granted to the Bank continuously perfected in the Collateral, and will execute and acknowledge and deliver or cause to be done, executed, acknowledged and delivered, all and every such further act, deed, conveyance, financing

8

statement, transfer and assurance as the Bank may from time to time reasonably request for the better assuring, conveying, transferring and confirming unto the Bank the Collateral that is now and hereafter constituted.

Article IV

**CONDITIONS PRECEDENT TO LOANS**

4.1     <u>Conditions Precedent</u>.  The obligation of the Bank to make the Loans is subject to the satisfaction of all of the following conditions on or prior to the date the initial Loans are funded (the "Funding Date") (in addition to the other terms and conditions set forth herein):

(a)     No Default.  There shall exist no Event of Default or Default on the Funding Date.

(b)     Representations and Warranties.  The representations, warranties and covenants set forth in Article VI shall be true and correct on and as of the Funding Date, with the same effect as though made on and as of the Funding Date.

(c)     Loan Documents/Security Instruments.  The Borrower shall have delivered to the Bank this Loan Agreement and the Security Agreement, each appropriately executed by the appropriate parties and, where applicable, acknowledged to the satisfaction of the Bank and dated as of the Closing Date, together with such financing statements, lien entries on vehicles, certificates, appropriate UCC-1 searches and other documents as shall be necessary and appropriate to perfect the Bank's liens and, subject only to the professional fees incurred in the Borrower's Chapter 9 proceeding, first priority security interests in the Collateral covered by said Security Instruments and reflecting no prior Liens.

(d)     Note.  The Borrower shall have delivered the Note payable to the order of Bank, appropriately and fully executed.

(e)     Bankruptcy Court Order.  Borrower shall have delivered to the Bank a file stamped copy of a court order entered by the Bankruptcy Court for the Northern District of Oklahoma in the Chapter 9 proceedings of Borrower approving the Revolver Commitment and the terms, provisions, conditions and limitations of this Agreement.

4.2     <u>Conditions to All Extensions of Credit</u>.  The obligation of the Bank to make any advances at any times under the Loans is subject to the satisfaction of the following additional conditions precedent on the date of making such advance (in addition to the conditions set forth in Article II):

(a)     Representations and Warranties.  The representations and warranties made by the Borrower herein and in any other Loan Documents or which are contained in any certificate furnished at any time under or in connection herewith shall be true and correct in all material respects on and as of the date of any advance under the Loans.

9

(b)     No Default or Event of Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the advance to be made on such date and the application of the proceeds thereof unless such Default or Event of Default shall have been waived in accordance with this Agreement.

(c)     No Material Adverse Effect.  No circumstance, event or condition shall have occurred or be existing which would reasonably be expected to have a Material Adverse Effect.

Each request for an advance under the Loans and each acceptance by the Borrower thereof shall be deemed to constitute a representation and warranty by the Borrower as of the date of such advance that the applicable conditions in subsections (a), (b) and (c) of this Section 4.2 have been satisfied.

Article V

## COVENANTS

The Borrower covenants and agrees with the Bank that so long as this Agreement is in effect (by extension, modification, amendment or otherwise) and until payment in full of all Indebtedness and the performance of all other obligations of the Borrower under this Agreement, unless the Bank shall otherwise consent in writing:

5.1     Maintenance of Entity Existence.  Borrower will do or cause to be done all things necessary to preserve and keep in full force and effect its corporate, limited liability company or partnership existence, rights and franchises and will continue to conduct and operate Borrower's business substantially as being conducted and operated presently.  Borrower is and will remain registered in each jurisdiction where the nature of the business or ownership of property by Borrower may require such registration and are and shall remain in good standing in any such jurisdiction.

5.2     Compliance with Applicable Laws.  Borrower will materially comply with the requirements of all applicable Laws and orders of any Tribunal and obtain any licenses, permits, franchises or other governmental authorizations necessary to the ownership of Borrower's properties or to the conduct of Borrower's business unless the failure thereof does not or could not constitute a Material Adverse Effect on Borrower or its business operations.

5.3     Notice of Litigation.  Immediately upon becoming aware of the existence of any action, suit or proceeding at law or in equity before any Tribunal, an adverse outcome in which would (i) materially impair the ability of the Borrower to carry on its business substantially as now conducted, (ii) materially and adversely affect the condition (financial or otherwise) of Borrower, or (iii) result in monetary damages in excess of $100,000.00, the Borrower will give the Bank a written notice specifying the nature thereof and what actions, if any, Borrower is taking and proposes to take with respect thereto.

5.4     Notice of Claimed Default.  Immediately upon becoming aware that the holder of any note or any evidence of indebtedness or other security in excess of $100,000.00 of the Borrower has given notice or taken any action with respect to a claimed default or event of

10

default thereunder, the Borrower will give the Bank a written notice specifying the notice given or action taken by such holder and the nature of the claimed default or event of default thereunder and what actions, if any, such Borrower are taking and proposes to take with respect thereto.

       5.5    <u>Requested Information</u>.  With reasonable promptness, the Borrower will give the Bank such other data and information as from time to time may be reasonably requested by the Bank.

       5.6    <u>Accounts at Bank</u>.  Borrower shall maintain its operating accounts at the Bank.

       5.7    <u>Disposition/Negative Pledge regarding Encumbrance of Collateral and Other Assets</u>.  Borrower will not sell or encumber any of the Collateral (other than in the ordinary course of business to bona fide third party purchasers resulting in the creation of accounts) without first obtaining the Bank's written consent thereto.

       5.8    <u>Other Agreements</u>.  Borrower will not enter into or permit to exist any agreement (i) which would cause an Event of Default or a Default hereunder; or (ii) which contains any provision which would be violated or breached by the performance of Borrower's obligations hereunder or under any of the other Loan Documents.

       5.9    <u>Organizational/Charter Documents</u>.  The Borrower will not amend, alter, modify or restate Borrower's Articles of Incorporation or Organization, or Bylaws or Operating Agreement, as applicable, in any way which would (i) change Borrower's name, adopt a trade name for Borrower or re-organize or re-incorporate Borrower in a different jurisdiction or otherwise change its "location" (as such term is defined and used in revised Article 9 of the UCC for perfection by filing purposes), or (ii) in any manner adversely affect Borrower's obligations or covenants to the Bank hereunder or under the Loan Agreements.

       5.10    <u>Change of Business</u>.  The Borrower will not engage in any business activity substantially different from or unrelated to its present business activities and operations.

       5.11    <u>Monthly Reports</u>. Within thirty (30) days following the close of each month end, at Bank's election, the Borrower will deliver to the Bank (a) its monthly financial statements, prepared in accordance with GAAP.  In addition, within twenty (20) days following the end of each month, the Borrower will deliver to the Bank schedules (certified to be true and correct by the appropriate officer of the Borrower) showing, effective as of the end of the applicable month, (i) the name of the Borrower's Account Debtors and others with like obligations payable to the Borrower; (ii) the amounts due and owing to the Borrower from each Account Debtor thereof; (iii) "aging" of each Account dating from the date of first invoice and shown by categories; (iv) any modification of the customary due date of any Account, (v) the amount of all obligations of the Borrower and to whom such obligations are owed (excluding obligations to the Bank) as of the end of the applicable month/quarter, (vi) "aging" of each such obligation as set forth in (iii) above, and (vii) modification of any due date of such obligations.

       5.12    <u>Other Information</u>.  The Borrower shall submit to the Bank such other information as reasonably requested by the Bank including, without limitation, yearly reports evidencing that the Borrower is maintaining insurance as required by this Agreement.

5.13    Annual Reports.  Borrower shall, no later than one hundred twenty (120) days after the end of its final year, deliver to Bank annual financial statements prepared in accordance with GAAP and accompanied by an unqualified audit letter of an outside independent firm of certified public accountants selected by the Borrower and approved by the Bank, including all footnotes.

5.14    Lines of Business.  The Borrower will not enter into any business, either directly or indirectly or through any of their subsidiaries or Affiliates, except only for those businesses in which the Borrower is currently engaged on the date of this Agreement and substantially similar business operations.

Article VI

## REPRESENTATIONS AND WARRANTIES

To induce the Bank to enter into this Agreement and to make the Loans to the Borrower under the provisions hereof, and in consideration thereof, the Borrower represents, warrants and covenants as follows:

6.1    Litigation.  Except as set forth on Exhibit C attached hereto and the Chapter 9 bankruptcy filing described in Section 4.1(h), there is no action, suit, investigation or proceeding threatened or pending before any Tribunal against or affecting the Borrower or any properties or rights of the Borrower, which, if adversely determined, would result in a liability of greater than $100,000.00 or would otherwise result in any Material Adverse Effect on the business or condition, financial or otherwise, of Borrower.  The Borrower is not in default with respect to any judgment, order, writ, injunction, decree, rule or regulation of any Tribunal.

6.2    Financial Statements.  The financial statements of Borrower furnished to the Bank have been prepared on a GAAP basis, show all material liabilities, direct and contingent of a type reflected on such financial statements, and fairly present the financial condition of the Borrower and the results of its operations for the periods then ended, and since such date there has been no material adverse change in the business, financial condition or operations of the Borrower.

6.3    Compliance with Applicable Laws.  The Borrower is in material compliance with all Laws, ordinances, rules, regulations and other legal requirements applicable thereto and the businesses conducted thereby, the violation of which could or would have a Material Adverse Effect on its business condition, financial or otherwise.

6.4    Possession of Franchises, Licenses.  Borrower possesses or has timely filed all franchises, certificates, licenses, permits and other authorizations from Governmental Authorities that are necessary in any material respect for the ownership, maintenance and operation of its properties and assets, and the Borrower is not in violation of any thereof in any material respect.

6.5    Disclosure.  Neither this Agreement nor any other Loan Document or writing furnished to the Bank by or on behalf of the Borrower in connection herewith contains any untrue statement of a material fact nor do such Loan Documents and writings, taken as a whole, omit to state a material fact necessary in order to make the statements contained herein and therein not misleading.  There is no fact known to the Borrower and not reflected in the financial

2672306.6

statements provided to the Bank which materially adversely affects its assets or in the future may materially adversely affect the business, property, assets or financial condition of the Borrower which has not been set forth in this Agreement, in the Loan Documents or in other documents furnished to the Bank by or on behalf of the Borrower prior to the date hereof in connection with the transactions contemplated hereby.

6.6     <u>Organization/Authority</u>.  The Borrower (i) is duly organized, validly existing and in good standing as a public trust, under the Laws of the State of Oklahoma, (ii) has the necessary organizational power and authority, and the legal right to own and operate its properties, to lease the properties it operates as lessee and to conduct the business in which it is currently engaged, and (iii) is in compliance with all Requirements of Law, except to the extent that the failure to comply therewith has not had and would not reasonably be expected to have a Material Adverse Effect.  The party executing the Loan Documents has all necessary trust power, authority and consent to singly execute and deliver to the Bank the Loan Documents on behalf and in the name of the borrower, pursuant to the charter documents of Borrower

6.7     <u>Enforceability</u>.  Each Loan Document to which it is a party constitutes a legal, valid and binding obligation of the Borrower enforceable against the Borrower in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

6.8     <u>No Legal Bar</u>.  The execution, delivery and performance of the Loan Documents, the borrowings hereunder and the use of the funds from the Loans will not violate any Requirement of Law or any contractual obligation of the Borrower (except those as to which waivers or consents have been obtained and those which would not reasonably be expected to have a Material Adverse Effect), and will not result in, or require, the creation or imposition of any Lien on any of its respective properties or revenues pursuant to any Requirement of Law or contractual obligation.  The Borrower is not in default under or with respect to any of its contractual obligations to any Person in any respect that has had or would reasonably be expected to have a Material Adverse Effect.

6.9     <u>Name Changes</u>.  The Borrower's official name as recorded on its currently effective organizational documents which are filed with the Secretary of State of Oklahoma is the same as found on the signature page of this Agreement.  The Borrower has not, during the preceding five years, entered into any contract, agreement, security instrument or other document using a name other than, or been known by or otherwise used any name other than, the name used by the Borrower herein.

2672306.6

Article VII

## **EVENTS OF DEFAULT**

7.1     Events of Default.  The occurrence of any one or more of the following events shall constitute an Event of Default (whether such occurrence shall be voluntary or involuntary or come about or be effected by operation of Law or otherwise):

(a)     The Borrower shall fail to make any monthly payment on the Note within five (5) days of the due date thereof, or fail to pay the Note after the same shall become due and payable (whether by extension, renewal, acceleration, maturity or otherwise); or

(b)     Any representation or warranty of the Borrower made herein or in any writing furnished in connection with or pursuant to any of the Loan Documents shall have been false or misleading in any material respect on the date when made; or

(c)     Borrower shall fail to duly observe, perform or comply with any covenant, agreement or term (other than payment provisions which are governed by Section 7.1(a) hereof) contained in this Agreement or any of the Loan Documents and such default or breach shall have not been cured or remedied within thirty (30) days following receipt of written notice thereof from the Bank; or

(d)     Any final judgment on the merits for the payment of money in an amount in excess of $100,000 shall be outstanding against the Borrower and such judgment shall remain unstayed and in effect and unpaid for more than thirty (30) days; or

(e)     Any event of default under any of the other Loan Documents.

7.2     Remedies.  Upon the occurrence of any Event of Default referred to in Section 7.1(e) the Commitment shall immediately and automatically terminate and the Note and all other Indebtedness shall be immediately due and payable, without notice of any kind.  Upon the occurrence of any other Event of Default set forth in Section 7.1, the Note or the Security Instruments, and without prejudice to any right or remedy of the Bank under this Agreement or the Loan Documents or under applicable Law or under any other instrument or document delivered in connection herewith, the Bank may (i) declare the Commitment terminated or (ii) declare the Commitment terminated and declare the Note and the other Indebtedness, or any part thereof, to be forthwith due and payable, whereupon the Note and the other Indebtedness, or such portion as is designated by the Bank shall forthwith become due and payable, without presentment, demand, notice or protest of any kind, all of which are hereby expressly waived by the Borrower.  No delay or omission on the part of the Bank in exercising any power or right hereunder or under the Note, the Loan Documents or under applicable law shall impair such right or power or be construed to be a waiver of any default or any acquiescence therein, nor shall any single or partial exercise by the Bank of any such power or right preclude other or further exercise thereof or the exercise of any other such power or right by the Bank.  In the event that all or part of the Indebtedness becomes or is declared to be forthwith due and payable as herein provided, the Bank shall have the right to set off the amount of all the Indebtedness of the

Borrower owing to the Bank against, and shall have a lien upon and security interest in, all property of the Borrower in the Bank's possession at or subsequent to such default, regardless of the capacity in which the Bank possesses such property, including but not limited to any balance or share of any deposit, demand, collection or agency account.  At any time after the occurrence of any Event of Default, the Bank may, at its option, cause an audit of any and/or all of the books, records and documents of the Borrower to be made by auditors satisfactory to the Bank at the expense of the Borrower.  The Bank also shall have, and may exercise, each and every right and remedy granted to it following an event of default under the terms of the other Loan Documents.

7.3    <u>Allocation of Payments After Event of Default</u>.  Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received on or in respect of the Indebtedness (or other amounts owing under the Loan Documents in connection therewith) shall be paid over or delivered as follows:

FIRST, to the payment of all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) of the Bank in connection with enforcing the rights and remedies of the Bank under the Loan Documents and any protective advances made with respect thereto or otherwise with respect to the Indebtedness owing to the Bank;

SECOND, to payment of any loan or other fees owed to the Bank hereunder;

THIRD, to the payment of all accrued interest and fees on or in respect of the Indebtedness;

FOURTH, to the payment of the outstanding principal amount of the Indebtedness hereunder;

FIFTH, to all other Indebtedness hereunder and other obligations which shall have become due and payable under the Loan Documents otherwise and not repaid pursuant to clauses "FIRST" through "FOURTH" above; and

SIXTH, to the payment of the surplus, if any, to the Borrower or such other Persons as may be lawfully entitled to receive such surplus.

In carrying out the foregoing, amounts received shall be applied in the order provided until exhausted prior to application to the next succeeding category.

Article VIII

**<u>MISCELLANEOUS</u>**

8.1    <u>Notices</u>.  Unless otherwise provided herein, all notices, requests, consents and demands shall be in writing and shall be either hand-delivered (by courier or otherwise), sent via facsimile or mailed by certified mail, postage prepaid, to the respective addresses specified below, or, as to any party, to such other address as may be designated by it in written notice to the other parties:

If to the Borrower, to:

> Craig County Hospital Authority
> 735 North Foreman Street
> P.O. Box 326
> Vinita, Oklahoma 74301
> Attention: Herb Crum, Chief Financial Officer

If to the Bank, to:

> The First National Bank & Trust Company
> 102 W. Illinois
> P.O. Box 407
> Vinita, Oklahoma  74301
> Attention:  Dee Robison, Chief Executive Officer

All notices, requests, consents and demands hereunder will be effective when hand-delivered or transmitted by facsimile by the Bank to the applicable notice address of the Borrower and within two (2) Business Days after being mailed by certified mail, postage prepaid, in each case given or addressed as aforesaid by either party hereto.

8.2    Place of Payment.  All sums payable hereunder shall be paid in immediately available funds to the Bank, at its principal banking offices in Vinita, Oklahoma, or at such other place as the Bank shall notify the Borrower in writing.  If any interest, principal or other payment falls due on a date other than a Business Day, then (unless otherwise provided herein) such due date shall be extended to the next succeeding Business Day, and such extension of time will in such case be included in computing interest, if any, in connection with such payment.

8.3    Survival of Agreements.    All covenants, agreements, representations and warranties made herein shall survive the execution and the delivery of Loan Documents.  All statements contained in any certificate or other instrument delivered by the Borrower hereunder shall be deemed to constitute representations and warranties by the Borrower.

8.4    Parties in Interest.  All covenants, agreements and obligations contained in this Agreement shall bind and inure to the benefit of the respective successors and assigns of the parties hereto, except that the Borrower may not assign its rights or obligations hereunder without the prior written consent of the Bank.

8.5    GOVERNING LAW; SUBMISSION TO JURISDICTION.

(a)    THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF OKLAHOMA, EXCEPT TO THE EXTENT THAT UNITED STATES FEDERAL LAW PERMITS ANY BANK TO CHARGE INTEREST AT THE RATE ALLOWED BY THE LAWS OF THE STATE WHERE THE BANK IS LOCATED.

2672306.6

(b)     ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THE LOAN DOCUMENTS SHALL BE BROUGHT IN THE COURTS OF THE STATE OF OKLAHOMA LOCATED IN CRAIG COUNTY OR OF THE UNITED STATES OF AMERICA FOR THE NORTHERN DISTRICT OF OKLAHOMA, INCLUDING THE BANKRUPTCY COURT THEREOF, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE BORROWER HEREBY ACCEPTS FOR ITSELF AND (TO THE EXTENT PERMITTED BY LAW) IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.  THE BORROWER HEREBY IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF *FORUM NON CONVENIENS*, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS.  THIS SUBMISSION TO JURISDICTION IS NON-EXCLUSIVE AND DOES NOT PRECLUDE THE BANK FROM OBTAINING JURISDICTION OVER THE BORROWER IN ANY COURT OTHERWISE HAVING JURISDICTION.

(c)     THE BORROWER HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER AT ITS SAID ADDRESS, SUCH SERVICE TO BECOME EFFECTIVE THIRTY (30) DAYS AFTER SUCH MAILING.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE BANK OR ANY HOLDER OF A NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST THE BORROWER OR ITS PROPERTIES IN ANY OTHER JURISDICTION.

8.6     Expenses; Indemnification.

(a)     Reimbursement of Expenses.  The Borrower agrees to pay on demand all costs and expenses reasonably incurred by the Bank in connection with the preparation, execution, delivery, administration, modification, and amendment of this Agreement, the other Loan Documents, and the other documents to be delivered hereunder, including the reasonable fees and expenses of counsel for the Bank with respect thereto and with respect to advising the Bank as to its rights and responsibilities under the Loan Documents.  The Borrower further agrees to pay on demand all costs and expenses reasonably incurred by the Bank, if any (including reasonable attorneys' fees and expenses), in connection with the enforcement (whether through negotiations, legal proceedings, or otherwise) of the Loan Documents and the other documents to be delivered thereunder.

(b)     Survival.  Without prejudice to the survival of any other agreement of the Borrower hereunder, the agreements and obligations of the Borrower contained in this Section 8.6 shall survive the repayment of the Loans, the Indebtedness and other obligations under the Loan Documents and the termination of the Commitments hereunder.

2672306.6

8.7    Maximum Interest Rate.  Regardless of any provision herein, the Bank shall never be entitled to receive, collect or apply, as interest on the Indebtedness any amount in excess of the maximum rate of interest permitted to be charged by the Bank by applicable Law, and, in the event the Bank shall ever receive, collect or apply, as interest, any such excess, such amount which would be excessive interest shall be applied to other Indebtedness and then to the reduction of principal; and, if the other Indebtedness and principal are paid in full, then any remaining excess shall forthwith be paid to the Borrower.

8.8    No Waiver; Cumulative Remedies.  No failure to exercise, and no delay in exercising, on the part of the Bank, any right, power or privilege hereunder or under any other Loan Document or applicable Law shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege of the Bank.  The rights and remedies herein provided are cumulative and not exclusive of any other rights or remedies provided by any other instrument or by law.  No amendment, modification or waiver of any provision of this Agreement or any other Loan Document shall be effective unless the same shall be in writing and signed by the Bank.  No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

8.9    Costs.  The Borrower agrees to pay to the Bank on demand all recording fees and filing costs and all reasonable attorneys' fees and legal expenses incurred or accrued by the Bank in connection with the preparation, negotiation, closing, administration of the Loan Documents and the filing and recording of the Security Instruments or any amendment, waiver, consent or modification to and of the Loan Documents.  In any action to enforce or construe the provisions of this Agreement or any of the Loan Documents, the prevailing party shall be entitled to recover its reasonable attorneys' fees and all costs and expenses related thereto.

8.10    Headings.    The article and section headings of this Agreement are for convenience of reference only and shall not constitute a part of the text hereof nor alter or otherwise affect the meaning hereof.

8.11    Severability.  The unenforceability or invalidity as determined by a Tribunal of competent jurisdiction, of any provision or provisions of this Agreement shall not render un-enforceable or invalid any other provision or provisions hereof.

8.12    Exceptions to Covenants.  The Borrower shall not be deemed to be permitted to take any action or fail to take any action which is permitted as an exception to any of the covenants contained herein or which is within the permissible limits of any of the covenants contained herein if such action or omission would result in the breach of any other covenant contained herein.

8.13    NO ORAL AGREEMENTS.   THE LOAN DOCUMENTS EMBODY THE ENTIRE AGREEMENT AND UNDERSTANDING BETWEEN THE PARTIES AND SUPERSEDE ALL OTHER AGREEMENTS AND UNDERSTANDINGS BETWEEN SUCH PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF, THE LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR

18

SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

8.14    Counterparts. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Agreement by signing such counterpart. Delivery of an executed counterpart of a signature page to this Agreement by telecopier shall be effective as delivery of a manually executed counterpart of this Agreement.

**8.15    WAIVER OF JURY. BORROWER FULLY, VOLUNTARILY, IRREVOCABLY, UNCONDITIONALLY AND EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED (OR WHICH MAY IN THE FUTURE BE DELIVERED) IN CONNECTION HEREWITH OR ARISING FROM ANY BANKING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, THE NOTE AND/OR THE SECURITY INSTRUMENTS. BORROWER AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. THE BORROWER (I) IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES; (II) CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE, THE BANK OR COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS; AND (III) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS CREDIT AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION 8.15.**

8.16    Benefit of Agreement.

(a)    Parties to Agreement. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns; *provided that*, the Borrower may not assign or transfer any of its interests and obligations without prior written consent of the Bank.

(b)    Certain Permitted Assignments. The Bank may, without notice to or consent of the Borrower, at any time assign and pledge all or any portion of its Loans and its Note to any Federal Reserve Bank as collateral security pursuant to Regulation A and any Operating Circular issued by such Federal Reserve Bank. No such assignment shall release the Bank from its obligations hereunder.

8.17    Not a Reportable Transaction. The parties signatory hereto acknowledge and stipulate and the Borrower represents to the Bank that the transactions contemplated by this

Agreement do not constitute a "Reportable Event" as that term is described and defined in regulations of the Treasury Department of the United States.

*[Signature Pages Follow]*

20

IN WITNESS WHEREOF, the Borrower has caused this Loan Agreement to be delivered to the Bank in Vinita, Oklahoma effective as of the day and year first above written by the undersigned duly authorized officer thereof.

**CRAIG COUNTY HOSPITAL AUTHORITY**, an Oklahoma public trust

By: _____

Name: _____

Title: _____

"Borrower"

**THE FIRST NATIONAL BANK & TRUST COMPANY**

By_____
           Dee Robison,
           Chief Executive Officer


           "Bank"

## <u>EXHIBITS</u>

Exhibit A           -           Revolver Note

Exhibit B           -           Litigation (§ 6.1)

## EXHIBIT A

## PROMISSORY NOTE
(Revolver Note)

$600,000.00                                                       February __, 2015
                                                                 Vinita, Oklahoma

FOR VALUE RECEIVED, **CRAIG COUNTY HOSPITAL AUTHORITY,** an Oklahoma public trust (the "Borrower") hereby promises to pay to the order of **THE FIRST NATIONAL BANK & TRUST COMPANY, Vinita, Oklahoma** ("Bank"), at Bank's principal offices in Vinita, Oklahoma, in lawful money of the United States of America, the principal sum of SIX HUNDRED THOUSAND AND NO/100 DOLLARS ($600,000.00), or so much thereof as shall have been advanced hereunder and remains unpaid as a result of draws made from time to time pursuant to the Revolver Commitment (as defined in the Loan Agreement) at final maturity on February __, 2020, together with interest thereon from the date hereof on the unpaid balance of principal from time to time outstanding and on any past due interest, at the variable annual rate of interest hereinafter specified, which interest is due and payable as it accrues on the last day of each calendar month, commencing March 31, 2015, and at final maturity on February __, 2020.

The rate of interest payable upon the indebtedness evidenced by this Note shall be a variable annual rate of interest equal from day to day to the Applicable Prime Rate, *plus* three hundred basis points percentage points (3.0%),. Any change in the Applicable Prime Rate shall be effective with respect to this Note as of the date upon which any change in such rate of interest shall occur. Interest shall be computed on the basis of a year of 360 days but assessed for the actual number of days elapsed. For the purposes of this Note, "Applicable Prime Rate" and other capitalized terms used but not defined herein shall have the meaning assigned to that term in the Loan Agreement.

After default in the payment of any amount of principal or interest owing hereunder within five (5) days of the scheduled due date thereof (whether on maturity, acceleration or otherwise) or upon the occurrence of any Event of Default as described in that certain Loan Agreement between Borrower and Bank dated effective as of even date herewith (together with any and all amendments, supplements and modifications thereof being collectively referred to as the "Loan Agreement"), the unpaid principal amount hereof shall bear interest computed at a variable annual rate equal from day to day to the then applicable contract rate *plus* three percentage points (3.0%) per annum, but in no event at a rate which is greater than permitted by law. Upon default in the payment of any amount of interest payable hereunder, such interest shall, to the full extent permitted by law, bear interest at the same rate as principal.

This Note is made pursuant to the Loan Agreement and is the Revolver Note described therein. The Loan Agreement contains, among other things, provisions for acceleration of the maturity hereof upon the events, terms and conditions therein specified, maximum Revolver Commitment Amount and automatic reduction thereof and other limitations on the amounts available to Borrower hereunder, automatic termination of the Revolver Commitment in

accordance with Section 2.1 of the Loan Agreement, and provisions for voluntary and mandatory prepayments hereof.

This Note is secured by the Collateral described in the Loan Agreement and the Security Instruments described and defined in the Loan Agreement (collectively, the "Security Instruments") which have been executed by Borrower and delivered to Bank.  Reference is hereby made to the Security Instruments for a description of the property, assets and interests thereby mortgaged, conveyed, pledged and/or assigned, as the case may be, the nature and extent of the security thereunder and the security interests carried forward or created thereby, and the rights of Bank (or the holder of this Note) and Borrower in respect thereof.

Should the indebtedness represented by this Note or any part thereof be collected at law or in equity or in bankruptcy, receivership or other court proceedings or this Note be placed in the hands of attorneys for collection after default, Borrower agrees to pay hereunder, in addition to the principal and interest due and payable hereon, reasonable attorneys fees, court costs and other collection expenses incurred by the holder hereof.

Borrower hereby waives presentment for payment, demand, notice of nonpayment, protest and notice of protest with respect to any payment hereunder and agrees to any extension of time with respect to any payment due hereunder, to any substitution or release of the security or collateral described in the Security Instruments and to the addition or release of any party liable hereunder.  No delay on the part of the holder hereof in exercising any rights hereunder shall operate as a waiver of such rights.

Upon the occurrence of any default hereunder, Bank shall have the right, immediately and without further action by it, to set off against this Note all money owed by Bank in any capacity to the maker or any other person who is or might be liable for payment hereof, whether or not due, and also to set off against all other liabilities of the maker to Bank all money owed by Bank in any capacity to each or any maker; and Bank shall be deemed to have exercised such right of setoff and to have made a charge against such money immediately upon the occurrence of such default even though such charge is made or entered into the books of Bank subsequently thereto.

This Note shall be construed and enforced in accordance with and governed by the laws of the State of Oklahoma and is delivered by Borrower payable to the order of Bank in Vinita, Oklahoma.

**CRAIG COUNTY HOSPITAL AUTHORITY**

By: _____
Name: _____
Title: _____

"Borrower"

**DUE:  February __, 2020**

# **EXHIBIT B**

(Litigation - §6.1)

"NONE"