IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
Jun 08, 2017

IN RE:

CRAIG COUNTY HOSPITAL
AUTHORITY,

        Debtor.

Case No. 15-10277-M
Chapter 9

## MEMORANDUM OPINION

In most situations, few people quarrel with the notion that an honest day's work merits an honest day's pay. The present dispute poses a simple question: if a party provides essential services to a Chapter 9 debtor after the filing of the bankruptcy case, does the creditor have a right to be paid when the assets of the debtor are sold as a going concern? The trustee charged with distributing the proceeds of sale says no. The suppliers of those essential services cry foul, asking that their contributions be recognized and compensated.  No one disputes that without the services rendered, the business operations of the debtor would have ceased. All parties point to provisions of the United States Bankruptcy Code to support their position. The Court, upon review of the facts and law, finds that it need look no further than the operative provisions of the confirmed plan. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to these contested matters pursuant to Federal Rule of Bankruptcy Procedure 9014.

### Jurisdiction

The Bankruptcy Court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C. § 1334(b),[1] and venue is proper pursuant to 28 U.S.C. § 1409.  Its reference to this Court is proper

---

[1] Unless otherwise noted, all references to statutory sections are references to the United States Bankruptcy Code, 11 U.S.C. § 101 *et. seq.*

pursuant to 28 U.S.C. § 157(a). Issues pertaining to interpretation of a confirmed plan are core proceedings as contemplated by 28 U.S.C. §157(b)(2)(L). This Court has jurisdiction to interpret and enforce its own prior orders.[2] Pursuant to § 945 of the Bankruptcy Code, the Court retains jurisdiction over this case to address contested provisions of a confirmed plan. Additionally, the Debtor has consented to the entry of further orders as necessary to implement provisions of the confirmed plan in this case.[3]

**Findings of Fact**

Craig County Hospital Authority (the "Hospital Trust") filed an original petition for relief under Chapter 9 of the Bankruptcy Code on February 25, 2015. On October 7, 2016, the Hospital Trust filed a Chapter 9 Plan (the "Original Plan")[4] that defined the term "Administrative Claim" as follows:

> "Administrative Claim" means a Claim against the Hospital arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the Chapter 9 Case that is entitled to priority or superpriority under § § 364(c)(1), 503(b), 507(a)(2), 507(b) and 901 but not including Post-petition Unsecured Claims."[5]

A "Post-Petition Unsecured Claim" was defined in the Original Plan as "an Unsecured Claim incurred by the Hospital in the ordinary course of business any time after the Petition Date."[6] The

---

[2] *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) ("Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders.").

[3] First Amended Plan for the Adjustment of Debts of Craig County Hospital Authority, at *Docket No. 255*, at 40 ¶ 5.1; Order Confirming Plan, *at Docket No. 271*.

[4] Plan for the Adjustment of Debts of Craig County Hospital Authority, *Docket No. 248*.

[5] *Id.* at 3–4 ¶ 2.1.4.

[6] *Id.* at 17 ¶ 2.1.85.

2

Original Plan further described the treatment of Post-Petition Unsecured Claims as follows:

> "Post-Petition Unsecured Claims shall be paid pro rata from the Sale Proceeds by the Creditor Trustee according to the terms of the Creditor Trust."[7] and

> "Holders of Unsecured Post-petition Claims shall not be entitled to file a Motion for the allowance of an Administrative Claim."[8]

Under the terms of the Original Plan, ordinary business expenses incurred in the operation of the Hospital that were unrelated to the administration of the bankruptcy case would be treated as general unsecured claims and would not receive any priority treatment. The Original Plan was not confirmed.

The Hospital Trust subsequently filed the Debtor's First Amended Chapter 9 Plan of Adjustment (the "Confirmed Plan"),[9] dated October 28, 2016, which this Court confirmed on November 29, 2016.[10] The Confirmed Plan includes the following definitions:[11]

> 2.1.4. "Administrative Claim" means a Claim against the Hospital arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the Chapter 9 Case that is entitled to priority or superpriority under §§ 364(c)(1), 503(b), 507(a)(2), 507(b) and 901 but not including Post-petition Unsecured Claims.

> 2.1.5. "Administrative Claims Bar Date" means, unless otherwise ordered by the Bankruptcy Court, the date established by the Bankruptcy Court and set forth in the Confirmation Order as the last day to file proof of an Administrative Claim, which date shall be no more than forty-five (45) calendar days after the Effective Date, after

---

[7] *Id.* at 33 ¶ 4.2.2.

[8] *Id.* at 34.

[9] *Docket No. 255.*

[10] *See* Order Confirming Plan, *at Docket No. 271* (the "Confirmation Order").

[11] All defined terms, except those defined herein, have the meaning assigned to them in the Confirmed Plan.

which date any Administrative Claim not timely filed with the Court shall be forever barred, and the Hospital and the Creditor Trust shall have no obligation with respect thereto.

2.1.53. "General Unsecured Claim" means an Unsecured Claim other than (I) a § 503(b)(9) Claim, (ii) an Administrative Claim, or a (iii) a Tort Claim or Employment Claim for which there is any Insurance Coverage.

2.1.84. "Post-petition Unsecured Claim" means an Unsecured Claim incurred by the Hospital in the ordinary course of business any time after the Petition Date.

2.1.112. "Unsecured Claim" means a claim that is not a Secured Claim or an Administrative Claim.[12]

The Confirmed Plan established an Administrative Claims Bar Date that was 45 days after its Effective Date.[13] The Confirmed Plan defines "Class 7: General Unsecured Claims," as follows:

3.7.1. Class 7 consists of the Holders of Post-Petition General Unsecured Claims and Pre-Petition General Unsecured Claims including, but not limited to: (I) Holders of Claims resulting from the Hospital's rejection of any executory contracts or unexpired leases as approved by the Court pursuant to a Rejection Order, (ii) Holders of Tort Claims or Holders of Employment Claims for which there is no Insurance Coverage, and (iii) Holders of General Unsecured Claims regardless of whether such Claims were incurred before or after the Petition Date.[14]

The treatment of "Post-Petition Unsecured Claims" in the Confirmed Plan is a follows:

4.2.2. Post-Petition Unsecured Claims.

Treatment: Post-Petition Unsecured Claims shall be treated in Class 7 in the same manner and priority as all Pre-Petition Unsecured Claims, unless the Holder of a Post- Petition Unsecured Claim timely files and obtains an Allowed Administrative Claim. To provide for the orderly administration of Post-Petition Unsecured Claims, the following procedure shall be followed by the Creditor Trustee and Holders of Post-Petition Unsecured Claims listed on Exhibit B-1. This procedure is necessary because the Hospital will continue to operate in the ordinary course of business until

---

[12] *Docket No. 255*, at 2–22.

[13] *Id.* at 4 ¶ 2.1.5.

[14] *Id.* at 29 ¶ 3.7.1.

the Closing on the Second and Third Sales thereby causing the amounts shown on Exhibit B-1 to change. Upon the Closing on the Second and Third Sales, the Hospital shall turn over all operations to the Buyer whereupon the amounts owed to Holders of Post-Petition Unsecured Claims will cease to change. As a result, the following procedure will be implemented:

* * * * [¶ 1 - 4 involve the determination of the final amount due each creditor. Those provisions are not relevant here because the parties have stipulated to the owed amount.]

***Holders of Unsecured Post-petition Claims shall also be entitled to file a Motion for the allowance of an Administrative Claim.*** In the event the dollar amount of Allowed Administrative Claims exceeds the funds available to pay such claims, then each Holder of such Allowed Administrative Claims shall be deemed to have agreed to a Pro Rata Payment in full satisfaction of such Allowed Administrative Claim. This provision is reasonable and necessary because the Hosital [sic] has no source of any additional funds to pay such claims and if the Holders of Allowed Administrative Claims do no [sic] consent to Pro Rata Payment as provided herein, then the Plan cannot be Confirmed. If the Plan is not Confirmed, then the Second and Third Sales will not Close and there will be no funds to pay anything to the Holders of Allowed Administrative Claims or any other Creditors. Based on all information available to the Hospital as of the filing of this Plan, the Hospital believes there will be sufficient funds to pay Allowed Administrative Claims in full.[15]

In addition, the First Amended Disclosure Statement associated with the Confirmed Plan (the "Disclosure Statement")[16] included the following statements:

- Generally, the Unsecured Claims arising both Pre-Petition and Post-Petition will be treated in Class 7 and based on information available as of the Filing of this Plan, the estimated Distributions to Class 7 should be between 90% and 97% of the Allowed Claims in Class 7. The percentage distribution will vary depending upon the amount of Post-Petition Unsecured Claims that obtain an Allowed Administrative Claim plus the additional funds discussed above.[17]

- Post-Petition Claims: [Treatment]: Persons asserting general unsecured claims for services rendered and/or costs or expenses incurred after the Petition Date and prior to

---

[15] *Id.* at 34–36 (emphasis added).

[16] *Docket No. 256.*

[17] *Id.* at 9.

5

the Effective Date: (1) Shall have their claims Allowed based upon the procedure set forth §4.2.2 of the Plan. Allowed Post-Petition Claims shall be treated and paid as part of Class 7 paid pro rata from Available Funds by the Creditor Trustee pursuant to the terms of the Creditor Trust. AND (2) May File no more than forty-five (45) calendar days after the Effective Date a Motion to have their Claims Allowed as an Administrative Claim and in such event, shall be treated as an set forth below.[18]

- Administrative Claims: [Treatment]: Holders of Unsecured Post-petition Claims shall be entitled to file a Motion for the allowance of an Administrative Claim.[19]

- General Unsecured Class of claims including both Pre-Petition and Post-Petition Claims: [Treatment]: Paid a Pro-Rata share of Available Funds pursuant to Terms of Creditor Trust. The estimated Distributions to Class 7 should be between 90% and 97% of the Allowed Claims in Class 7.[20]

The parties submitted no evidence regarding the circumstances that led to the filing of the Confirmed Plan.

Our present dispute comes before the Court pursuant to four Motions for Allowance of Administrative Claim and Notice of Opportunity for Hearing (the "Motions"), filed January 17, 2017, by NEO Orthopedics and Rehabilitation, Inc. ("NEO"),[21] Regional Medical Laboratory, Inc. ("Regional"),[22] Lakeland Financial Services, LLC ("Lakeland Financial"),[23] and Lakeland Office Systems, Inc. ("Lakeland Office")[24] (collectively the "Applicants"). Chris Conine, Trustee of the

---

[18] *Id.*

[19] *Id.* at 10.

[20] *Id.* at 11.

[21] *Docket No. 304.*

[22] *Docket No. 305.*

[23] *Docket No. 306.*

[24] *Docket No. 307.*

Craig County Hospital Creditor Trust (the "Trustee"), filed objections to each of the Motions.[25] At a hearing held on February 14, 2017, the parties informed the Court that there are no material disputes of fact, as represented by joint stipulations of fact regarding the claims of each Applicant,[26] and that the Motions present identical legal issues. This Memorandum Opinion addresses all four Motions.

Applicants provided post-petition services to the Hospital Trust.[27] NEO provided rehabilitative services to patients. Regional performed laboratory services related to medical testing of patients. Lakeland Financial and Lakeland Office leased office equipment to the Hospital Trust. Each Applicant was listed on Exhibit B-1 to the Confirmed Plan, which listed claimants holding "Post-Petition General Unsecured Claims," and the estimated amount to be paid to each under the Confirmed Plan.[28] The parties have stipulated that the amounts owed to each of the Applicants represent actual and necessary costs and expenses of preserving the operations *of the Hospital Trust*

---

[25] *Docket Nos. 321–23, and 325*. In addition, an objection was filed by McIntosh Services, Inc., *at Docket No. 348.*

[26] *Docket Nos. 342–45.*

[27] *Id.*

[28] *Docket No. 255*, at 221–26. These amounts were further amended in the Notice Regarding Post-Petition Claims, *at Docket No. 297*. The stipulated claim amount for each of the Applicants is as follows:
1. Lakeland Financial: $1,438.50;
2. Lakeland Office: $28,517.97;
3. NEO: $529,402.77;
4. Regional: $85,601.03.

*See Docket Nos. 342–45.*

during the pendency of the Chapter 9 case.[29] All contracts or leases between each of the Applicants and the Hospital Trust were deemed rejected pursuant to the Confirmed Plan.[30] Pursuant to the Confirmed Plan, all assets of the Hospital Trust have been sold. The Craig County Hospital Creditor Trust (the "Creditor Trust") was created for the purpose of collecting and distributing property to holders of allowed professional claims, 506(b) expense claims, administrative claims, or other unsecured claims.[31]

Applicants timely filed the Motions seeking treatment of their claims as Administrative. The Trustee filed objections to each of the Motions. In addition, McIntosh Services, Inc. ("McIntosh"), a pre-petition unsecured creditor, filed a brief in opposition to the Motions.[32]

## Conclusions of Law

*Effect of Confirmed Plan*

There are no constitutional or jurisdictional issues raised by the Motions as a result of the Confirmed Plan.[33] "A confirmation order is a final judgment in the case, and neither it nor the plan

---

[29] *Id.*

[30] *Docket No. 255*, at 74 ¶ 6.4.1. The executory contract between Regional and the Hospital Trust was previously assumed by the Hospital Trust, and various cure costs paid, pursuant to the Order Authorizing Assumption of Lease with Regional Medical Laboratory, Inc., *at Docket No. 207.*

[31] *See Docket No. 255*, at 8 (definition of "Creditor Trust Beneficiary").

[32] *Docket No. 348.*

[33] *See* § 904 (". . . unless the debtor consents or the plan so provides, . . ."). In addition to consent to the entry of the Confirmed Plan, the Hospital Trust also consented to the "entry of any further orders as necessary or required to implement the provisions of the Plan or any and all related transactions." *See Docket No. 255*, at 40 ¶ 5.1.

that it confirms may be attacked other than by filing a timely appeal."[34] None of the parties to this matter objected to the terms of the Confirmed Plan, nor did they timely appeal the Confirmation Order.[35] As such, the terms of the Confirmed Plan are binding on the Creditor Trust, as successor to the Hospital Trust, and all creditors, including the Applicants, even if those terms are inconsistent with the Bankruptcy Code,[36] and even if the parties did not understand the meaning or effect of its provisions.[37] The Court's sole function in this matter is to interpret the Confirmed Plan and decide whether the Applicants' claims are entitled to the same priority as professional fees and § 503(b)(9) claims, or whether they will be grouped with general unsecured claims in Class 7. If the provisions of Chapter 9 are determined to further apply to this matter, it is only to the extent they are invoked through the Confirmed Plan.

***Oklahoma Rules of Contract Interpretation***

Although some exceptions apply, a court generally interprets a confirmed plan according to contract construction principles.[38] Under its own terms, "the rights and obligations arising under the

---

[34] *In re K.D. Co.*, 254 B.R. 480, 490 (10th Cir. BAP 2000) (citing *Stoll v. Gottlieb*, 305 U.S. 165, 170–72 (1938); *In re Salina Speedway, Inc.*, 210 B.R. 851, 855–56 (10th Cir. BAP 1997), *abrogated on other grounds by CF & I Fabricators of Utah, Inc.*, 150 F.3d 1233 (10th Cir. 1998)).

[35] *See Docket No. 271.*

[36] § 944. *See also United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 274 (2010) (parties bound by plan confirmation order where they had notice of legal error in order and failed to object or timely appeal).

[37] *See In re K.D. Co.*, 254 B.R. at 491 (citing *Turney v. FDIC*, 18 F.3d 865 (10th Cir. 1994); *DiBerto v. Meadows at Madbury, Inc. (In re DiBerto)*, 171 B.R. 461, 470–71 (Bankr. D.N.H. 1994)).

[38] Exceptions exist where statutory or other principles override the general principle that parties are allowed to resolve conflicts by contract. *See, e.g., In re CF & I Fabricators of Utah,*

9

[Confirmed ] Plan . . .shall be governed by, and construed and enforced in accordance with, the laws of the State of Oklahoma without giving effect to the principles of conflict of laws thereof."[39] Under Oklahoma law:

1. "A contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful."[40]

2. "[C]ourts interpreting a contract must consider the entire agreement 'so as to give effect to every part, if reasonably practicable.'"[41]

3. "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."[42]

4. "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible, subject, however, to the other provisions of [Oklahoma contract interpretation statutes]."[43]

---

*Inc.*, 150 F.3d 1233, 1239 (10th Cir. 1998) ("We do not dispute a reorganization plan has some indicia of a contract. For instance, the interested parties negotiate and draft the document, reach mutual agreement, and consideration is exchanged. Yet, it is also clear a confirmed plan is much more than a contract. For example, once confirmed, a plan is enforceable as a court order against parties who did not even agree to its terms.") (finding debtor continued to owe statutory fees to the United States Trustee even though the confirmed plan was silent on the issue).

[39] *Docket No. 255*, at 91–92.

[40] Okla. Stat. tit. 15, § 152.

[41] *Scrivner v. Sonat Exploration Co.*, 242 F.3d 1288, 1291 (10th Cir. 2001) (quoting Okla. Stat. tit. 15, § 157).

[42] Okla. Stat. tit. 15, § 154.

[43] *Id.* § 155.

5. "[W]hether a contract or provision is ambiguous is a question of law to be determined only with reference to the contract itself."[44]

6. "Merely because the parties offer different interpretations of a contract does not make it ambiguous; the relevant inquiry is whether the contract is reasonably susceptible to more than one construction such that reasonable persons could honestly disagree as to the meaning."[45]

7. "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable and capable of being carried into effect, if it can be done without violating the intention of the parties."[46]

8. "The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed."[47]

***Interpretation of the Confirmed Plan***

The Confirmed Plan provides that Post-Petition Unsecured Claims, as listed on Exhibit B-1 to the Confirmed Plan and later amended by the Notice Regarding Post-Petition Claims,[48] will be

---

[44] *Ryan v. Am. Nat. Energy Corp.*, 557 F.3d 1152, 1158 (10th Cir. 2009).

[45] *Id.* (citing *Otis Elevator Co. v. Midland Red Oak Realty, Inc.*, 483 F.3d 1095, 1102 (10th Cir. 2007); *M.J. Lee Constr. Co. v. Okla. Transp. Auth.*, 125 P.3d 1205, 1213 (Okla. 2005)).

[46] Okla. Stat. tit. 15, § 159.

[47] *Id.* § 160.

[48] *Docket No. 297.*

treated as General Unsecured Claims in Class 7.[49] It also provides that a Holder of a Post-Petition Unsecured Claim is "entitled" to file a motion for allowance as an Administrative Claim.[50] The Confirmed Plan defines "Administrative Claim" to mean

> a Claim against the Hospital arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the Chapter 9 Case that is entitled to priority or superpriority under § § 364(c)(1), 503(b), 507(a)(2), 507(b) and 901 ***but not including Post-petition Unsecured Claims.***[51]

The Court notes an apparent contradiction because ¶ 4.2.2 of the Confirmed Plan allows a Holder of a Post-Petition Unsecured Claim to seek priority treatment of its claim, but ¶ 2.1.4 defines an Administrative Claim to exclude such claims. The Court's reading of the Confirmed Plan, as a whole, is that the parties intended for post-petition unsecured claimholders to be allowed to submit motions to the Court for a determination of their priority treatment, and did not intend, by the language in ¶ 2.1.4, to categorically exclude Post-Petition Unsecured Claims from consideration as Administrative Claims.[52] Therefore the Court will ignore the last six words of ¶ 2.1.4, as being inconsistent with the remainder of the Confirmed Plan and the intention of the parties.

The Confirmed Plan establishes a procedure whereby Holders of Post-Petition Unsecured Claims may seek allowance, upon submission of a motion to this Court, as an Administrative Claim.

---

[49] *Docket No. 255*, at 29 ¶ 3.7.1 – .2.

[50] *Id.* at 37 ¶ 4.2.2.

[51] *Id.* at 4 ¶ 2.1.4. (emphasis added).

[52] To be sure, parties to the Confirmed Plan do not agree whether such claims should be treated as priority claims, but the Court does not believe any party intended *this language* to exclude all post-petition unsecured claims from administrative status. "Words in a contract which are wholly inconsistent with its nature, or with the main intention of the parties, are to be rejected." Okla. Stat. tit. 15, § 169.

Any party seeking such treatment has agreed, as a condition of the Confirmed Plan, to accept pro rata payment on its claim with other holders of Allowed Administrative Claims. The parties stipulate that each of the Applicants 1) provided post-petition goods or services to the Hospital Trust; 2) have not been paid for those goods or services; and 3) provided goods or services that "were actual and necessary costs and expenses of preserving the operations *of the Debtor in Chapter 9*."[53]

The parties disagree as to the criteria the Court should use to determine whether a particular claimant is eligible for treatment as an Administrative Claim. They direct the Court's attention to provisions of Chapter 9 of the Bankruptcy Code, although they differ radically in their interpretation of those provisions. For example, the Trustee and McIntosh take the position that Applicants cannot take advantage of § 503(b)(1)(A), which provides administrative status for the "the actual, necessary costs and expenses of preserving the *estate*[.]"[54] They argue that because no "estate" is created under Chapter 9, § 503(b)(1)(A) does not confer administrative status for general operating expenses of the Hospital Trust. The Applicants likewise cite § 503(b)(1)(A), but urge the Court look to language in §§ 901(b) and 902 to substitute the words "preserving the debtor" in its reading of § 503(b)(1)(A), thereby bringing their claims under the statute. The Court finds the parties' focus on the statutory language of Chapter 9 to be misplaced.

Under the Confirmed Plan, the Hospital Trust sold all of its assets and ceased operations. The Creditor Trust is not tasked with running a business, but instead was required to close the sale of the Hospital Trust and distribute the sale proceeds to creditors. In addition to outlining the terms of the asset sale, the primary purpose of the Confirmed Plan was to delineate how much, and in what

---

[53] *Docket Nos. 342–45* (emphasis added).

[54] § 503(b)(1)(A) (emphasis added), made applicable in Chapter 9 pursuant to § 901.

order, each creditor is to be paid.[55] Therefore, the question is not "what Chapter 9 allows," but whether the parties, under the Confirmed Plan, expressed an intention to give administrative, priority status to post-petition claimants that conferred actual benefit on the Hospital Trust during the course of this case.

The definition of an Administrative Claim includes costs or expenses of administration related to the Chapter 9 case entitled to priority under §§ 364(c)(1), 503(b), 507(a)(2), 507(b) and 901. The Confirmed Plan provides an elaborate procedure whereby creditors may seek priority treatment for their claims based on those statutory provisions, one of which is § 503(b). The Trustee and McIntosh suggest that the Court should adhere strictly to the language of § 503(b)(1)(A) and case law interpreting the absence of an "estate" in a Chapter 9 case.[56] The Court finds this approach too restrictive. If the Court were to adopt this reading, <u>no</u> creditors of the Hospital Trust would qualify as Administrative Claims under the Confirmed Plan. If that was the intention of the parties, they would have maintained the language found in the Original Plan. There, the parties stated a clear intention that no claims for operating expenses would be treated as priority claims, regardless of any benefit conferred on the Hospital Trust. By adding a procedure to the Confirmed Plan whereby claimants could seek administrative priority status, the Court concludes that the parties intended to give priority treatment to post-petition creditors that provided actual, necessary costs and expenses of *preserving the post-petition debtor*, i.e., the Hospital Trust. Any other reading would make the

---

[55] § 941 ("The debtor shall file a plan for the adjustment of the debtor's debts."); § 943(b) ("The court shall confirm the plan if– . . . (3) all amounts to be paid by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable[.]").

[56] *See, e.g., In re N.Y. City Off-Track Betting Corp.*, 434 B.R. 131 (Bankr. S.D.N.Y. 2010).

procedure for treatment as an Administrative Claim under the Confirmed Plan a nullity. The Court cannot believe that the parties would craft such a procedure if they intended that no claimants would qualify for priority treatment.[57] Therefore, based on its reading of the Confirmed Plan as a whole, the Court concludes parties that provided goods or services that were actual and necessary costs and expenses of *preserving the operations of the Hospital Trust* during the pendency of case hold Allowed Administrative Claims under the Confirmed Plan. As the parties have stipulated, each of the Applicants' claims meet this criteria.

This is the equitable result. The services provided by Applicants were essential to the ongoing operations of the Hospital Trust. A hospital that does not provide rehabilitative services, or run lab tests, or maintain its office is not going to stay in business. If the Applicants stop providing services, there is no hospital to sell. Everyone loses. When the Hospital Trust amended its plan to provide a detailed procedure for the allowance of administrative claims, it effectively consented to the payment of valid administrative claims. Were this Court to rule otherwise, it would be countenancing something akin to a "bait and switch" procedure, whereby creditors are enticed to vote for confirmation of a plan with the promise of administrative priority, only to be told "Gotcha! No claims qualify!" when they ultimately seek payment. The Court will not take the rule of law in this jurisdiction down that path.

***Assumed contract with Regional***

In addition to the reasons stated above, the claim of Regional finds further support for priority treatment. The Hospital Trust sought, and the Court authorized, the assumption of its

---

[57] Okla. Stat. tit. 15 § 159. ("A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable and capable of being carried into effect, if it can be done without violating the intention of the parties.").

contract with Regional.[58] In *N.L.R.B. v. Bildisco and Bildisco* ("*Bildisco*"),[59] a case under Chapter 11, the United States Supreme Court did not focus on the formal difference between the concepts of "debtor" and "debtor-in-possession," but instead found that "it is sensible to view the debtor-in-possession as the same 'entity' which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have done absent the bankruptcy filing."[60] Although not given all the attributes of a "debtor-in-possession," the Hospital Trust was empowered, by Chapter 9 of the Bankruptcy Code, to accept or reject executory contracts.[61] Having accepted the benefits of an executory contract, the debtor-in-possession in *Bildisco* was required to "assume[] the contract *cum onere*,"[62] meaning that "the expenses and liabilities incurred may be treated as administrative expenses, which are afforded the highest priority on the debtor's estate."[63] This Court believes those principles are equally relevant to a post-bankruptcy debtor entity in a Chapter 9 case. Here, the services of Regional were both *supplied to* and *beneficial to* the post-bankruptcy Hospital Trust.[64] Under the terms of the

---

[58] *Docket No. 207*.

[59] 465 U.S. 513 (1984).

[60] *Id.* at 528.

[61] § 901 (incorporating § 365).

[62] *Bildisco*, 465 U.S. at 531.

[63] *Id.* (citing § 503(b)(1)(A)).

[64] *In re Amarex*, 853 F.2d 1526, 1530 (10th Cir. 1988) (citing *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976) ("When the claim is based upon a contract between the debtor and the claimant, the case law teaches that a creditor's right to payment will be afforded first priority only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.")).

Confirmed Plan and *Bildisco*, the claim of Regional, based on 1) an assumed contract; and 2) actual, necessary costs and expenses of preserving the Hospital Trust, is an Allowed Administrative Claim.[65]

### Conclusion

The Motions for Allowance of Administrative Claim and Notice of Opportunity for Hearing, filed January 17, 2017, by NEO Orthopedics and Rehabilitation, Inc., *at Docket No. 304*, Regional Medical Laboratory, Inc., *at Docket No. 305*, Lakeland Financial Services, LLC, *at Docket No. 306*, and Lakeland Office Systems, Inc., *at Docket No. 307*, are granted.

Separate orders consistent with this Memorandum Opinion shall be entered concurrently herewith.

Dated this 8th day of June, 2017.

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

7112.v7

---

[65] At a hearing held on May 3, 2017, counsel for Trustee suggested that Regional should have filed a claim for rejection damages under the Confirmed Plan. The Court disagrees, and finds that the claim of Regional is not based on damages for the rejection of its contract, but is instead based on compensation for the value of goods and services it provided to the Hospital Trust post-petition.